IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBIN HOEY,                                  ) | |
| )                                  | |
| Plaintiff,             ) | |
| )                                  | |
| v.                                               ) | Civil Action No. 07-00919(JDB) |
| )                                  | Oral Argument Requested |
| THE DISTRICT OF COLUMBIA,       ) | |
| And CATHY LANIER                     ) | |
| )                                  | |
| Defendants.            ) | |

**DEFENDANT DISTRICT OF COLUMBIA AND CATHY LANIER'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S PARTIAL CROSS
MOTION FOR SUMMARY JUDGMENT
AND
REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT DISTRICT OF
COLUMBIA AND CATHY LANIER'S MOTION
TO DISMISS THE COMPLAINT, AND/OR, IN THE ALTERNATIVE, MOTION
FOR SUMMARY JUDGMENT**

Defendants District of Columbia and Cathy Lanier, by and through the

undersigned counsel, herein oppose Plaintiff's Partial Cross Motion for Summary

Judgment and Reply to Plaintiff's Opposition to their Motion for Dismiss the Complaint,

and/or, in the Alternative, Motion For Summary Judgment.  Plaintiff's Motion should be

denied on the following grounds:

1.       The position of Commander, is an "at will" position as a matter of law,

and plaintiff does not possess a protected interest in continued employment in that

position.                                  .

2.       Assuming *arguendo* that the position of Commander is a Career

Service position, plaintiff has failed to exhaust his administrative remedies under the

Comprehensive Merit Personnel Act and dismissal is appropriate.

3.     Defendant Cathy Lanier is entitled to Qualified Immunity.

4.     Plaintiff is Not Entitled to Declaratory and Injunctive Relief.

5.     Plaintiff's Intentional and Negligent Infliction of Emotional Distress Claims Fail As a Matter of Law.

6.     Plaintiff Is Not Entitled to Punitive Damages Against Defendants District of Columbia or Chief Lanier.

<u>Preliminary Statement</u>

On April 19, 2007, D.C. Metropolitan Police Department Police Chief Cathy Lanier (hereafter defendant Lanier) demoted plaintiff Robin Hoey from the rank of Commander to the rank of Captain. Plaintiff initiated an action challenging defendant Lanier's demotion with the Office of Employee Appeal. See Exhibit A (OEA Petition) attached to separately file Defendants' Motion to Dismiss/Motion for Summary Judgment. Upon information and belief, OEA has not issued a "Final Decision" regarding plaintiff's claims.

On May 16, 2007, plaintiff filed this action against defendants District of Columbia and Lanier claiming that they deprived him of a cognizable property interest as a career service employee without due process of law, a violation of the Fifth Amendment of the United States Constitution. According to plaintiff, defendants demoted him from the rank of Commander to the rank Captain without an opportunity to be heard or other means of redress afforded to career service employees under the Comprehensive Merit Personnel Act (hereinafter "CMPA"). *See* Complaint, generally.

Under District law, a Commander position with the D.C. Metropolitan Police Department is an at-will position, excepted from Career Service. *See* D.C. Official Code

§1-608(d-2)(1); DPM 872.5.  The Commander position was intentionally omitted and excluded under the Collective Bargaining, which covers only Career Service positions and states that an employee can not be disciplined without cause.  See Collective Bargaining Agreement between the Metropolitan Police Department and its employees, Article II at p.1, Article XII § 1(b) at p.9, hereto attached as Exhibit A, which provides that "discipline may be imposed only for cause".

As set forth below, plaintiff's cross motion for summary judgment should be denied because these defendants are entitled to judgment as a matter of law on all claims set forth in his Complaint.

### ARGUMENT

A.    **Plaintiff Has Not Exhausted his Administrative Remedies in Challenging His Demotion as a "Career Service Employee," and Consequently, Dismissal of Counts I, II, III, and IV is Appropriate**

The position of Commander is not a Career Service position, which is discussed in detail below in ¶ B.  However, assuming, for the purpose of legal argument only, that the position of Commander is a Career Service position and the CMPA applies, plaintiff has failed to exhaust his administrative remedies with the D.C. Office of Employee Appeals ("OEA").  Therefore, dismissal is appropriate.  Plaintiff's opposition correctly states the general proposition that "actions filed pursuant to 42 USC 1983 do not require an exhaustion of administrative remedies." However, there is an exception to that general rule. When the underlying constitutional right plaintiff seeks to enforce is procedural due process, exhaustion is required.  See *Stanley v. Proctor*, Civil Action No. 98-2780, (PLF)(D.D.C 2002).  See also, *Burns  v. Harris County Bail Bond Board,* 139 F.3d 513, 519 (5th Cir. 1998)([A] plaintiff cannot argue that her due process rights have been

violated when she has failed to utilize the state remedies available to her."); *Kauth v. Harford Ins.,* 852 F.2d 951,955 (7th Cir. 1988)(plaintiff simply cannot refuse to pursue available state remedies and then come into federal court complaining that he was not afforded due process); *Aronson v. Hall*, 707 F.2d 963, 694 (2d. Cir. 1983)("Having failed to pursue available administrative state review, Dr. Aronson is hardly in a position to claim that such review denied him due process."

In *Stanley v. Proctor,* Civil Action No. 98-2780, (PLF)(D.D.C 2002), three plaintiffs, all of whom were Commanders, were terminated from their positions by Interim Police Chief Sonya Proctor. See Exhibit B, *Stanley v. Proctor* decision.  Those plaintiffs, like Robin Hoey, claimed that they were deprived of their Fifth Amendment due process rights under 42 USC 1983.  *Id.*  The Court held that the plaintiffs, who filed an OEA complaint but did not receive a Final Decision from OEA, were required to exhaust ***all*** administrative remedies prior to filing suit in federal Court and dismissed their due process claims accordingly. *Id* at 4-5.  *See also*, Alexis *v. District of Columbia*, 44 F.Supp. 2d 331, 334-35 (D.D.C. 1999)(Court dismissed due process property interest claim, holding that terminated employees covered under CMPA were obligated to obtain an OEA Final Decision before seeking relief in Court).

Plaintiff Hoey filed an action in the OEA, but has not received and/or pled that he received a Final Decision from OEA.  See Complaint, generally. Plaintiff must first exhaust all his administrative remedies from OEA prior to filing suit against these defendants.   Only after OEA issues a ruling can a plaintiff bring an action in **Superior Court**, not this Court, for judicial review.  *Id.*  The D.C. Court of Appeals has held that:

> "with few exceptions, the **CMPA is the exclusive remedy for a District of Columbia public employee who has a work-related complaint of any**

> **kind**." *Baker v. District of Columbia*, 785 A.2d 696, 697 (D.C. 2001)
> (citations omitted). As such, "'the Superior Court is not an alternative forum
> …, but rather serves as a last resort for reviewing decisions generated by
> CMPA procedures.'" *Id. at* 698 (internal quotations omitted).

*Armstead*, 810 A.2d at 400.

In *District of Columbia v. Thompson* 593 A.2d 621, 634 (D.C. 1991), the D.C.
Court of Appeals held that the CMPA constitutes the exclusive remedy for virtually all
"instances where an employee claimed wrongful treatment cognizable under" the CMPA
provisions addressing "performance ratings," "adverse actions," and employee "grievances."
*Thompson,* 593 A.2d at 635. In *Thompson,* the plaintiff brought suit for emotional distress
and defamation, based on twenty-two memoranda written by her supervisor during her two-
year employment with the District. *Id.* at 625, 635. The court upheld the dismissal of those
claims, writing:

> It would seem, therefore, from the purpose and text of CMPA, including its
> judicial review provisions, that the Council "plainly intended" CMPA to
> create a mechanism for addressing virtually every conceivable personnel
> issue among the District, its employees, and their unions – with a reviewing
> role for the courts as a last resort, not a supplementary role for the courts as
> an alternative forum.

*Id.* at 634 (footnote omitted).

The *Thompson* court also emphasized that the breadth of the CMPA—which covers
any employee "grievance"—is expansive; it encompasses "'any matter under the control of
the District government which impairs or adversely affects the interest, concern, or welfare
of employees.'" *Thompson,* 593 A.2d at 626, n.6, quoting D.C. Code, § 1-603.1(10). The
court found that the D.C. Council, in enacting the CMPA, clearly intended to foreclose in-
court litigation of all employee grievances "arising out of the employment relationship."
*Thompson*, 593 A.2d at 624.

Plaintiff Hoey's challenge to his demotion and his claims of intentional and emotional distress fall within the exclusive jurisdiction of the CMPA. Plaintiff is administratively barred from seeking relief in this Court because the CMPA requires that plaintiff exhaust his administrative remedies before OEA. Any other redress must be sought in Superior Court.

Plaintiff cannot claim he has a career service property interest in the Commander employee and "entitled to all the benefits of the CMPA" and ignore the CMPA's requirement that career service employees who have workplace disputes must file an OEA action and exhaust their administrative remedies. See Complaint at ¶ 3. See *Baker v. District of Columbia*, 785 A.2d 696, 697 (D.C. 2001) (citations omitted)(finding that 'the Superior Court is not an alternative forum …, but rather serves as a last resort for reviewing decisions generated by CMPA procedures."). Accordingly, if the plaintiff has a career service property interest in his Commander position as he alleges, this Court lacks jurisdiction to adjudicate this workplace dispute and the defendants are entitled to dismissal of Counts I, II, III, and IV of plaintiff's complaint.

**B.    The Commander Position is an "At Will" Position and Plaintiff Was Not Vested With a Protected Interest In Employment.**

   1.    Personnel Records Do Not Establish a Property Interest in Employment

In support of Plaintiff's Opposition to the Defendants' Motion to Dismiss an/or in the Alternative, Motion for Summary Judgment/Cross Motion for Partial Summary Judgment (hereinafter Opposition), plaintiff attaches numerous personnel exhibits that he claims confirms that his position as Commander was a career service position. *See* Opposition at 2 ("paperwork documenting his promotions and evaluation confirm that he

6

is a Career Service employee"). *See also* Opposition at 12, 13 ("Considering all of the documents . . . Hoey was a member of the Career Service"). Plaintiff mistakenly relies upon these exhibits, which, as a matter of law, *do not* establish whether he had a property interest in his position as Commander.

A public employee has a property interest in employment "only if the law or contract defining the employee's job expressly provides that the employee can be discharged only for cause." Tribe, L. American Constitutional Law (2nd Ed. 1998), at 697; see *Arnett v. Kennedy*, 416 U.S. 134, 167, n.2 (1974)(citing *Board of Regents v. Roth*, 408 U.S. at 577). *See also, Cambriello v. County of Nassau*, 292 F.3d 307, (2d Cir 2002) ("state law determines whether a public employee has a property interest in continued employment").

 *Cambriello, supra,* involved a public employee who was demoted from a position he was promoted to after it was discovered that his promotion violated the Collective Bargaining Agreement endorsed by state regulation. Cambriello sued, claiming that he had a property interest in his new position and that his demotion violated due process. The court ruled that Cambriello, as a public employee, could not reasonably expect a property interest in a promotion that violates law or regulation. *Id.* at 313.

Similarly, plaintiff Hoey cannot rely on the referenced personnel records to create any property interest in his Commander position, or reasonably expect a property interest in his Commander position based on the referenced personnel records. The only relevant contract that exists between the employees of MPD and the MPD is the Collective Bargaining Agreement. Notably, the position of Commander is **not covered** under the Collective Bargaining Agreement. The only employees covered under the Collective

Bargaining Agreement.  The Collective Bargaining Agreement provides that discipline of police privates, including investigators and desk sergeants, detectives, and police sergeants employed in the uniformed and plainclothes forces of the Metropolitan Police Department, unless assigned to the Internal Affairs Division may be imposed only for cause.  See Collective Bargaining Agreement between the Metropolitan Police Department and its employees, Article II at p.1, Article XII § 1(b) at p.9, hereto attached as Exhibit A, which provides that "discipline may be imposed only for cause".   The Collective Bargaining Agreement expressly excludes the positions of inspector, **commander**, and assistant chiefs of police- all positions which are at-will positions.  See Exhibit B.

Assuming *arguendo* that the referenced personnel documents can be collectively viewed as support for plaintiff's claim that he had  a Career service appointment to the Commander position, then the promotion contradicts the District's Personnel Manual (DPM) § 872.5 and his claim fails as a matter of law.  An agency cannot give a property interest to an employee in direct contradiction with a state statute or regulation. See *Cambriello,*  292 F.3d at 314 ("Cambriello could claim no property right that contravenes the CBA")(Internal quotations omitted).

2.    Under District Law, the Commander Position is an Excepted
Service, At-Will Position.

It is undisputed that the plaintiff has no contract or collective bargaining agreement that expressly provides that he could be discharged only for cause. The law, therefore, can only define the plaintiff's property interest in this case.  Further, since state, not federal, law gives an employee a property interest in his continued employment,

the plaintiff's claim of a property interest in his position as a commander must emanate from an interpretation of District law.  *See Cambriello* 292 F.3d at 313.

When issues of state law are before a federal court, the court is bound by the Erie Doctrine to follow the state courts' interpretation of state law.  See generally *Butner v. United States*, 440 U.S. 48, 51 (U.S. 1979).  The D.C. Court of Appeals has decided that deference should be paid to an agency's interpretation of statutes, regulations, and rules "which it administers . . . so long as that interpretation is reasonable and consistent with the statutory [or regulatory] language." *Kamerow v. D.C. Rental Hous. Comm'n*, 891 A.2d, 256-257 (D.C. 2006).

In his motion, plaintiff correctly notes that D.C. Official Code § 1-608(d-2)(1) expressly refers to Career Service *and* Excepted Service appointments to the position of Commander.  Indisputably, a Commander can be appointed to an Excepted Service position.  See D.C. Official Code § 1-608(d-2)(1) which provides that "the chief of police shall recommend to the Director of Personnel criteria for Career Service promotion and **Excepted Service appointment to the positions of Inspector, Commander and Assistant Chief of Police**."(emphasis added). "Employees in the Excepted Service do not have any job tenure or protection".  *See* D.C. Official Code §1-609.05.  Plaintiff fails to acknowledge that consistent with the statutory provision, District regulations state unequivocally, "Assistant Chiefs of Police, Commanders and Inspectors **are excepted** [from Career Service], who serve at the pleasure of the Chief of Police. The Chief of Police has the discretion to return Assistant Chiefs of Police, Commanders and Inspectors to their previous rank/position."(emphasis added). *See* DPM § 872.5.  The Mayor has delegated personnel and decision making authority to the Chief of Police. See DCMR

6A-800.7 ("Subject to <u>applicable</u> law, rules, regulations, and orders of the Mayor or directives pursuant to an order of the Mayor, the Chief of Police shall have full power and authority over the department and all functions, resources, officials, and personnel assigned thereto.")

The Metropolitan Police Department has reasonably, and consistent with the law, interpreted D.C. Official Code §§ 1-608(d-2)(1), 1-609.05; DPM §872.5 and DCMR 6A-800.7 to mean that a commander is an at-will employee and <u>an employee</u> has no property interest in his continued employment at that rank.  This Court must defer to the agency's interpretation of the District's laws and regulations it administers.

Because the position of Commander is an excepted service position within the ambit of D.C. Official Code §1-608.01(d-2)(1) and DPM § 872.5, plaintiff's employment was "at will." Therefore, plaintiff had no job tenure or protection, and he is not entitled to a review of MPD's decision.  Plaintiff did not possess any property interest protected by the Due Process Clause. As such, the defendants are entitled to dismissal of Count I, II, III, and IV of plaintiff's complaint.

Plaintiff's argument that *Fonville v. District of Columbia*, 448 F.Supp.2d 219 (D.D.C. 2006) (Sullivan, J), is applicable to the instant case is not only without merit, but disingenuous.  Plaintiff acknowledges that the Court's holding in *Fonville* that a "commander promoted from the rank is not an at will employee" pre-dated the enactment of § 1-608(d-2)(1).  That statute clearly states that there is an Excepted Service Appointment, or at-will appointment, to the position of Commander.

The statutory changes to the CMPA clearly invalidate the Court's holding in *Fonville, supra.*   Plaintiff's argument that the statute relied upon by Judge Sullivan has

remained unchanged is incorrect.  The old statute relied upon by the Court in *Fonville* is silent as to the Commander position and the new statutory law expressly references the Commander position as Excepted Service, or at-will position.  Therefore, the new statutory language precludes this Court from relying upon the Court's holding in *Fonville,* and dismissal of this case against these defendants is warranted.   See D.C. Official Code § 1-608(d-2)(1).

In light of the aforementioned, the plaintiff is not entitled to declaratory or injunctive relief declaring that 1) he was a Career Service member of the Metropolitan Police Department in the position of Commander, 2) he was demoted without cause in violation of his constitutional right to due process. If the Court finds that the plaintiff's claim is meritorious, declaratory or injunctive relief is still not warranted because the plaintiff will not suffer irreparable harm, as if he prevails against these defendants, he would be entitled to back pay and reinstatement.

## C.     Defendant Lanier is Entitled to Qualified Immunity

Plaintiff is not entitled to discovery on defendant Lanier's entitlement to qualified immunity in this case.  Plaintiff has failed to pled any facts to show that defendant Lanier acted unreasonably and violated any clearly established right pursuant to 42 U.S.C. § 1983.  The Chief of Police reasonably, and consistent with the law, interpreted D.C. Official Code §§ 1-608(d-2)(1), 1-609.05; DPM §872.5 and DCMR 6A-800.7 to mean that a commander is an at-will employee and that plaintiff had no property interest in his continued employment at that rank.   The purpose of qualified immunity is to protect governmental employees against insubstantial lawsuits that have the following societal costs: l) expenses of litigation; 2) diversion of official energy from

pressing public issues; 3) deterrence of able citizens from acceptance of public office; and 4) the possibility that the fear of being sued will dampen the ardor of all but the most resolute individuals. *Harlow v. Fitzgerald*, 457 U.S. 800, 8l4 (l982).

Qualified immunity shields officials, such as defendant Lanier, from liability as long as their action could reasonably have been thought to be consistent with the rights they are alleged to have violated. *Anderson v. Creighton*, 483 U.S. 635, 638 (l987). An officer should prevail on the qualified immunity defense even if he is mistaken, if a reasonable officer could have believed that the action taken was not in violation of clearly established constitutional law. *Anderson*, 483 U.S. at 64l. Qualified immunity thus protects all but the plainly incompetent or those who knowingly violate the law.

In this case, it cannot be said that defendant Lanier knowingly violated plaintiff's constitutional rights. As argued above, under District of Columbia law, the position of Commander is an excepted service position, which is an "at will" position. The Mayor delegated personnel and decision making authority to the Chief of Police. Defendant Lanier.  As Chief of Police, defendant Lanier relied on statutory law and personnel regulations when she demoted plaintiff.  Because defendant Lanier believed she was exercising the authority given to her by the Mayor, defendant Lanier's action could reasonably be believed to be consistent with the rights she is alleged to have violated. Thus, the facts pled by the plaintiff are insufficient to support a finding that defendant Lanier acted in any unreasonable manner in making personnel decisions that resulted in his demotion.  Accordingly, she is qualifiedly immune from suit.

**D.**      **Plaintiff is Not Entitled to Declaratory or Injunctive Relief.**

Plaintiff avers that while he seeks compensatory damages under 42 U.S.C. §

1983, he also seeks injunctive relief.  The defendants have moved for dismissal of the

entire case because plaintiff has not demonstrated that there has been any constitutional

violation or common claims.  In order to obtain injunctive relief, plaintiff must

demonstrate that there is a strong likelihood of prevailing on the underlying claims.

Since dismissal of the underlying claims is appropriate, plaintiff is not entitled to

injunctive relief.

**E.**      **Plaintiff's Intentional and Negligent Infliction of Emotional Distress Claims Fail as Matter of Law.**

Plaintiff fails to address in his opposition, the District's specific argument with

respect to the CMPA governing personnel issues or claims involving suits for emotional

distress. See *Thompson,* 593 A.2d at 625 (dismissing suit for emotional distress and

defamation). Count II, plaintiff's Intentional and Negligent Infliction of Emotional Distress,

fails because plaintiff under *Thompson* is barred from litigating these claims in this Court.

Moreover, plaintiff did not exhaust his administrative remedies with respect to these claims.

Plaintiff argues that he has pled sufficient facts to meet the District of Columbia

courts' heightened standard for intentional infliction of emotional distress claims in

employment cases. See *Anderson v. Ramsey*, Civil Action No. 04-56, (April 19,

2006)(2006 U.S. Dist. LEXIS 21034 at pg 10.)  *See also Howard University v. Best*, 484

A.2d 958 (D.C. 1984); *Drejza v. Vaccaro* 650 A.2d 1308 (D.C. 1984).  Courts in this

jurisdiction are "especially skeptical of intentional infliction of emotional distress claims

in an employment" context because "employer-employee conflicts do no generally rise to

the level of outrageous conduct"- even in cases where an employee is discharged. *Id.* at 9;

*See also Kerrigan v. Britches of Georgetown, Inc*., 705 A.2d 624, 628 (D.C. 1997).

Courts require that the employer's behavior "must go beyond all bounds of decency" and

be "intolerable in a civilized society." *Id at 10. See also Crowley v. North Am. Telecoms.*

*Ass'n*, 691 A.2d 1169, 1172 (D.C. 1997).

While plaintiff argues that his demotion was made in a public manner, plaintiff

does not dispute that the demotion took place in Chief Cathy Lanier's office- in a private,

professional fashion. Plaintiff relies on *Fonville* supra, in support of his emotional

distress claim.  However, *Fonville* is inapposite to the instant case. *Fonville* involved

allegations of defamation, which is not alleged in the instant case.  Given the manner and

the circumstances surrounding plaintiff's demotion, there are simply insufficient facts to

support a finding that the defendants engaged in "extreme or outrageous conduct"

"beyond all bounds of decency" against him.  Plaintiff's intentional infliction of

emotional distress claims must fail as a matter of law.

### F.    Plaintiff Is Not Entitled to An Award of Punitive Damages

#### 1.    Punitive damages are not available against the District.

In *Smith v. District of Columbia*, 336 A.2d 831 (D.C. 1975), the District of

Columbia Court of Appeals, after a lengthy discussion of the policy considerations and

weight of authority against allowing punitive damages against municipalities, found that

punitive damages were ***not*** available against the District absent a statute expressly

authorizing it.  The court found that assessing punitive damages against the District (which

would require payment by tax dollars) would be in conflict with the purpose of punitive

damages because it would only serve to punish the taxpayers, who are the exact people who

should benefit from such an award. *Id.*

While the Court in *Smith* mentioned in dicta that there may be a theoretical possibility that punitive damages might be available against the District of Columbia under certain undefined "extraordinary circumstances," this issue was resolved in favor of the District in *Teart v. WMATA*, 686 F.Supp. 12 (D.D.C. 1988). In *Teart*, the Court first reiterated the long standing precedent that "[i]n the absence of express statutory authority, punitive damages are not recoverable against the District of Columbia." *See Teart,* 686 F.Supp. at 13. The *Teart* Court reviewed the "extraordinary circumstances" language included in the *Smith* decision, holding that this language was nothing but dicta, and stated specifically that *no* court had ever imposed punitive damages against the District. *Id.* at 14. The Court further held that "[t]his court will not create a baseline definition of a term which was formulated in dicta." *Id.* Accordingly, because existing case law does not allow for punitive damages against the District of Columbia, and, because even if there did exist a possibility for imposition of such damages under "extraordinary circumstances," clearly this case is not within such a category. Thus, the claim for punitive damages must be dismissed.

### 2. <u>Punitive damages are not available against defendant Lanier.</u>

Plaintiff seeks punitive damages against defendant Lanier. However, the purpose of a punitive damages award, the *Smith* court held, is to deter wrongful behavior and to benefit those wronged by such behavior. Plaintiff has failed to plead sufficient facts to support any claim for punitive damages against defendant Lanier. See Complaint, generally. As such, plaintiff claim fails as a matter of law.

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

_____/s/ Patricia Jones_____
PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV


_____//Leah  Taylor_____
LEAH BROWNLEE TAYLOR [488966]
Assistant Attorney General
441 Fourth St., N.W., 6th Floor South
Washington, D.C.  20001
(202) 724-7854; (202) 727-6295

16

IN THE UNTED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

---

ROBIN HOEY,                          )
                                     )
            Plaintiff,               )
                                     )
vi.                                  )          Civil Action No. 07-00919(JDB)
                                     )
THE DISTRICT OF COLUMBIA, and        )
Chief Cathy Lanier,                  )
                                     )
            Defendants.              )

---

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS  NOT IN GENUINE DISPUTE

In support of their Opposition to the Plaintiff's Partial Cross Motion for Summary Judgment, these defendants herein submit their Response to Plaintiff's Statement of Material Facts Not in Genuine Dispute, and respond in like-numbered paragraphs, and state as follows:

1.      Denied. The position of Commander is an at-will position, excepted from Career Service. *See* D.C. Official Code §1-608(d-2)(1); DPM 872.5. See also Exhibit B, Collective Bargaining Agreement, which covers Career Service positions. Plaintiff's position of Commander is intentionally omitted and excluded under the Collective Bargaining, which applies to career service employees.

2.      These defendants admit that plaintiff was promoted from the rank of Inspector to the rank of Commander on or about August 1, 2004, in his 20th year of service with MPD and placed in the Sixth District.  Whether plaintiff was "held in high regard in the community" is not material.  Uniform employees of MPD promoted to Commander do not maintain their status as Career Service employees.

3.    Admitted.

4.    Admitted, but not material.

5.    Admitted, but not material.

6.    Admit that plaintiff was a Career Service employee at the rank of Captain. Denied because as to the statement because Commanders do not maintain a Career Service status in the position as Commander, but maintain Career Service status in the position of Captain, as reflected by the "Career" language in the personnel records.

7.    Denied nor admitted. All of the personnel action forms attached to plaintiff's motion are not legible, see Exhibit D.

8.    Admitted

9.    Denied. Chief Lanier explained to Robin Hoey that she wanted her own command team.

10.    Admitted, except to the statement that "Robin Hoey is a Career Service public employee entitled to all the benefits of the District of Columbia Comprehensive Merit Protections Act ("CMPA"). Robin Hoey is not entitled to all the benefits of the District of Columbia Comprehensive Merit Protections Act ("CMPA") in the position of Commander, an at-will position.

11.    Denied. Commanders do not maintain a Career Service status in the position as Commander, but maintain Career Service status in the position of Captain.

12.    Admitted as to "The CMPA creates a property interest in public employment and establishes as Career Service." Employees can be appointed or promoted based on merit under District law.

13.    Admitted.

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

_____/s/ Patricia A. Jones_____
PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV

_____/s/ Leah Brownlee Taylor_____
LEAH BROWNLEE TAYLOR [0488966]
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-7854; (202) 727-6295

COLLECTIVE BARGAINING AGREEMENT

BETWEEN

GOVERNMENT OF THE DISTRICT OF COLUMBIA
METROPOLITAN POLICE DEPARTMENT

AND THE

FRATERNAL ORDER OF POLICE
MPD LABOR COMMITTEE

EFFECTIVE THROUGH
**September 30, 2008**

# TABLE OF CONTENTS

| Article | Subject | Page |
|---|---|---|
| 1 | Preamble | 1 |
| 2 | Recognition | 1 |
| 3 | Probationary Officers | 2 |
| 4 | Management Rights | 2 |
| 5 | No Strike Clause | 3 |
| 6 | Union Membership | 4 |
| 7 | Dues Checkoff | 4 |
| 8 | Union/Employee Responsibilities | 4 |
| 9 | Rights of Employees/Union Representatives | 5 |
| 10 | Release of Information | 8 |
| 11 | Use of Departmental Facilities | 9 |
| 12 | Discipline | 9 |
| 13 | Investigatory Questioning | 13 |
| 14 | Transfers | 16 |
| 15 | Leave | 16 |
| 16 | Employee Records | 18 |
| 17 | Joint Safety Committee | 18 |
| 18 | Union Representatives on Boards | 19 |
| 19 | Grievance Procedure | 20 |
| 20 | Special Assignments | 26 |
| 21 | Funeral Expenses | 26 |
| 22 | Voluntary Changes in Shifts and Days Off | 26 |
| 23 | Tardiness | 26 |
| 24 | Scheduling | 27 |
| 25 | Seniority | 28 |
| 26 | Temporary Details and Acting Pay | 28 |
| 27 | Performance Evaluation | 29 |
| 28 | Polygraph Examinations | 29 |
| 29 | Blood Donation | 29 |
| 30 | Overtime/Compensatory Time | 30 |
| 31 | Dental Insurance | 30 |
| 32 | Optical Insurance | 31 |
| 33 | Prepaid Legal Plan | 32 |
| 34 | Health | 33 |
| 35 | Wages | 33 |
| 36 | Retention Differentials | 34 |
| 37 | Shift Differential | 34 |
| 38 | Tech Pay and Other Current Special Duty and Skill Premiums | 35 |
| 39 | Uniform and Clothing Allowance | 35 |
| 40 | Distribution of Agreement | 35 |
| 41 | Administrative Leave for Off Duty Job-Related Activities | 36 |
| 42 | Charitable Contributions | 36 |
| 43 | Physical Fitness | 36 |
| 44 | Employee Assistance Program | 36 |
| 45 | Catastrophic Illness/Injury Donation Program | 37 |
| 46 | Back Pay | 38 |
| 47 | 20-Year Retirement | 38 |
| 48 | Savings Clause | 39 |
| 49 | Duration and Finality of Agreement | 39 |

## ARTICLE 1
## PREAMBLE

**Section 1**
This Collective Bargaining Agreement (this Agreement) is entered into between the Metropolitan Police Department (the Department or the Employer), and the Fraternal Order of Police/Metropolitan Police Department (FOP/MPD) Labor Committee or the Union.

**Section 2**
The parties to this Agreement hereby recognize that the collective bargaining relationship reflected in this Agreement is of mutual benefit and the result of good faith collective bargaining between the parties.  Further, both parties agree to establish and promote a sound and effective labor-management relationship in order to achieve mutual understanding of practices, procedures and matters affecting conditions of employment and to continue working toward this goal.

**Section 3**
The parties hereto affirm without reservation the provisions of this Agreement, and agree to honor and support the commitments contained herein.  The parties agree to resolve whatever differences may arise between them through the avenues for resolving disputes agreed to through negotiations of this Agreement.

**Section 4**
It is the intent and purpose of the parties hereto to promote and improve the efficiency and quality of service provided by the Department.  Therefore, in consideration of mutual covenants and promises contained herein, the Employer and the Union do hereby agree as follows:

## ARTICLE 2
## RECOGNITION

The Employer recognizes the FOP/MPD Labor Committee as the exclusive representative of a unit consisting of the following employees of the Metropolitan Police Department:

*All police privates, including investigators and desk sergeants, detectives, and police sergeants employed in the uniformed and plainclothes forces of the Metropolitan Police Department, unless assigned to the Internal Affairs Division, excluding management executives, confidential employees, supervisors, and employees engaged in personnel work in other than a purely clerical capacity.*

# ARTICLE 3
## PROBATIONARY OFFICERS

Officers serving a probationary period shall not be entitled by virtue of this Agreement to any rights and/or privileges that exceed or are in conflict with the provisions of the Comprehensive Merit Personnel Act, or any Departmental rules and regulations governing probationary employees.

# ARTICLE 4
## MANAGEMENT RIGHTS

The Department shall retain the sole right, authority, and complete discretion to maintain the order and efficiency of the public service entrusted to it, and to operate and manage the affairs of the Metropolitan Police Department in all aspects including, but not limited to, all rights and authority held by the Department prior to the signing of this Agreement.

Such management rights shall not be subject to the negotiated grievance procedure or arbitration. The Union recognizes that the following rights, when exercised in accordance with applicable laws, rules and regulations, which in no way are wholly inclusive, belong to the Department:

1.      To direct employees of the Department;

2.      To determine the mission, budget, organization, number of employees, number, type and grade of employees assigned, the work project, tour of duty, methods and processes by which such work is performed, technology needed, internal security practices, or relocation of facilities;

3.      To relieve employees of duties because of lack of work or other legitimate reasons;

4.      To hire, promote, transfer, assign and retain employees in positions within the Department;

5.      To suspend, demote, discharge, grant or deny step increases and take other disciplinary actions against employees for cause;

6.      To take any action necessary to carry out the mission of the Department in an emergency situation, and to alter, rearrange, change, extend, limit or curtail its operations or any part thereof;

7.      To determine the qualifications of employees for appointment, promotion, step increases, and to set standards of performance, appearance and conduct; and,

8.      To formulate, change or modify Department rules, regulations and procedures, except that no rule, regulation or procedure shall be formulated, changed or modified in a manner contrary to the provisions of this Agreement.

## ARTICLE 5
## NO STRIKE CLAUSE

**Section 1**

For the purpose of this contract, the term "strike" includes any strike or concerted action with others involving failure to report for duty; the willful absence from one's position; the slowdown or stoppage of work; the abstinence in whole or part from the full, faithful, and proper performance of the duties of employment or in any manner interfering with the operation of the Department for the purpose of inducing, influencing, or coercing a change in the conditions or compensation or the rights, privileges or obligations of employment.

**Section 2**

Neither the Union nor any employee in the bargaining unit shall initiate, authorize, actively support or participate in a strike.

**Section 3**

The Department shall discipline, as deemed appropriate, any employee who engages in a strike. Any disciplinary action taken by the Department against striking employees shall not be construed as a violation by the Department of any provisions of this Agreement.

**Section 4**

In the event of a strike as prohibited by this Article, the Employer agrees that there shall be no liability on the part of the FOP/MPD Labor Committee provided that upon notification, in writing, by the Employer of said strike, the FOP/MPD Labor Committee meets the following conditions:

1.      Within no more than eight (8) hours after receipt of written notification by the Employer of any strike, the FOP/MPD Labor Committee shall publicly disavow the action by posting a notice on each Union space on Departmental bulletin boards and issuing a press release to the media stating the strike is unauthorized and unsupported by the Union;

2.      The FOP/MPD Labor Committee shall in good faith promptly direct (in writing, verbally, or both) the employees in the bargaining unit to return to work notwithstanding the existence of any strike and use every reasonable effort in cooperation with the Employer to terminate the strike; and,

3.      The Union's failure to comply with the above conditions, in the event of a strike in which members of the bargaining unit participate, shall be grounds for the Employer to terminate this contract.

3

## ARTICLE 6
## UNION MEMBERSHIP

**Section 1**

Any employee may join or refrain from joining the Union without interference, coercion, restraint, discrimination or reprisal from the Department or the Union.  An individual's right or status as an  employee will not be affected because of membership or non-membership in the Union.

**Section 2**

This Agreement does not preclude any employee from bringing matters of personal concern to the attention of the Union or management officials without fear of reprisal or intimidation.


## ARTICLE 7
## DUES CHECKOFF

**Section 1**

The Employer agrees to withhold the payment of dues or a service fee to the Union from the wages of every unit employee.

**Section 2**

Membership in the Union shall not be a condition of employment in the Metropolitan Police Department.

**Section 3**

The Employer will be held harmless against any and all claims, demands, suits or any other liability arising out of its good faith actions to implement this article and will in all cases be held harmless in any claim concerning service fee payments**.**


## ARTICLE 8
## UNION/EMPLOYEE RESPONSIBILITIES

**Section 1**

Neither the Union nor any employee in the bargaining unit shall conduct Union business or carry on Union activities (soliciting members, distributing literature, attending Union meetings, etc.) during employee working time or on the Department's premises, except as provided for in Article 11.  Distribution of literature or other contacts pertaining to Union business will be conducted during non-work time of both the Union representatives and members being contacted.  There is to be no interference by members in a non-duty status with other employees' performance of official duty during working hours.

**Section 2**

The Union agrees that an employee who requests Union representation shall be represented at each stage of the grievance procedure by no more than one Union/employee representative.

**Section 3**
The Union, in recognition of its responsibility, agrees to train its Chief Stewards and Stewards in the scope of their duties and in the manner in which such duties are to be accomplished.
**Section 4**
The Union shall provide management with a current list of all Chief Stewards and Stewards and keep management informed in writing of any changes in union representatives.


# ARTICLE 9
## RIGHTS OF EMPLOYEES/UNION REPRESENTATIVES

**Section 1**
Union employee representatives shall be selected in any manner determined by the Union from among actively employed members. The Union shall be entitled to designate not to exceed fifteen (15) Chief Stewards and not to exceed sixty-nine (69) Stewards. Members of the Union's Executive Board, shall be assigned to work the same tour of duty on which the Department's Executive Staff (i.e., Assistant Chief, Commander and Inspector) work the majority of their basic tours to facilitate their interaction with Departmental officials and to carry out their representational duties. Such members shall not exceed fifteen (15). The Union shall identify to the Employer the names of the members of the Union's Executive Board.

**Section 2**
1.      The Employer shall not discriminate against any employee because of his membership or non-membership in the Union. The Employer shall not restrain or coerce any employee in the exercise of any rights granted under this Agreement, or discriminate against or take reprisals against any employee for exercising any rights granted under this Agreement.

2.      The Employer recognizes that it may not transfer, change or terminate a detail or assignment of a unit member in reprisal for exercising a right under this Agreement. This section does not modify or diminish management's rights to take personnel actions under applicable regulations, Department orders, and other relevant articles in this agreement. When a claim is made that the Employer's action has violated this Section, the Employer, upon request, shall provide a non-discriminatory reason(s) for such action.

3.      At the Union's option, a grievance alleging a violation of this section may be filed directly with the appropriate Assistant Chief and then at Step 2 (with the Chief of Police) under Article 19 of this Agreement.

**Section 3**

Official time, i.e. time within a member's scheduled working hours, shall be provided in accordance with this article to investigate, process and present grievances. The use of all official time will be recorded on the Official Time Form (Exhibit A).

**Section 4**

The Employer shall provide union stewards, employees and union officials with official time in the manner hereinafter described to receive, investigate, prepare and present grievances to management.

1.       Employees shall be granted official time as authorized (up to one hour per grievance as needed) upon individual request within their regularly scheduled working hours to report grievances to their union representatives and to present grievances to management.

2.       Union Stewards shall be granted up to one hour of official time within their regularly scheduled working hours per grievance to investigate, receive and present each grievance in accordance with the provisions of the negotiated grievance procedure.

Chief Stewards shall be entitled up to two (2) hours of official time within their regularly scheduled working hours per grievance in order to reduce the grievance to writing and to present the grievance in accordance with their responsibilities under the negotiated grievance procedure.

4.       The designated Union representatives shall be granted official time within their regularly scheduled working hours as needed to attend meetings of Boards provided for in this Agreement to which they are appointed and to attend conferences with management.

5.       The Labor Committee Chairman shall be entitled to use up to forty (40) hours each week for the purpose of carrying out his representational responsibilities under this Agreement and applicable law. The Labor Committee Chairman shall respond to inquiries by the Department's Labor Relations Representative regarding the type and number of representational activities engaged in for a particular period; such inquiries to be reasonable in number and nature.

6.     The Labor Committee Chairman and one (1) Committee Official, as permanently designated by the Chairman, shall be assigned  to work the same tour of duty on which the Department's Executive Staff (i.e., Assistant Chief, Commander and Inspector) work the majority of their basic tours of duty to facilitate their interaction with Departmental officials and to carry out their representational duties for the term of this Agreement.

7.       In the event a member of the Executive Board must fulfill the duties of a Steward or Chief Steward under this Article, he/she shall be entitled to the same amount of official time as would have been provided to the Steward or Chief Steward to fulfill their responsibilities under this Article.  This substitution will only be permitted in the absence or illness of a steward assigned to a representational matter.

8.       The Employer shall provide up to forty hours of official time each week for one

Bargaining Unit member as permanently designated by the Chairman, to receive, investigate, prepare for and represent members in any meetings, conferences, or similar events of a member required to appear before or on behalf of the Office of Police Complaints.

## Section 5

The Employer agrees that permission for an employee to advise his/her Union of his/her grievance or for the Union representative to hear the employee's grievance will not be unreasonably delayed; however, the Union recognizes that workload and scheduling considerations will not always allow for release of employees from their assignments, nor shall the presentation or receipt of grievances interfere with the performance and reporting requirements of employees.

## Section 6

The following procedure shall be utilized by employees and designated Union representatives and officials requesting official time for the purposes described in Section 4.

When it is necessary for contacts to be made between employees and Union representatives in connection with the prosecution of a grievance, the member who desires the meeting shall request authorization from his/her Lieutenant, or above, to be relieved from duty for this purpose. The Lieutenant, or above, shall be informed of the purpose of the request, the employee's destination, if he is leaving the immediate work area, the amount of time needed and the employee he/she desires to contact.  On return, the employee must report to the Lieutenant, or above, and initial the Official Time Form completed by the Lieutenant.

## Section 7

This article does not preclude employees from selecting an individual other than a Union representative to represent the employee in a grievance, except that no rival organization may represent an employee in the negotiated grievance procedure, and provided also that if other than a Union representative is used, a representative of the exclusive organization must be given an opportunity to be present at the resolution of the grievance.  The grant of official time detailed in Section 4 applies only to a FOP/MPD Union representative.

## Section 8

Any persons filing a grievance or representing an employee in a grievance subject to the provisions of this Agreement shall be assured freedom from restraint, coercion, or reprisal. However, notwithstanding the general nature of labor relations activities, the parties shall maintain a business like decorum that supports conflict resolution and shall refrain from harassment and the use of scurrilous or disrespectful language.

## Section 9

Five (5) members of the Union's negotiating team shall initially be entitled to official time that coincides with their scheduled tour of duty to prepare for negotiation of a successor collective bargaining agreement. The determination of the number of active employees on the Union's negotiating team during collective bargaining shall be the subject of negotiations during Ground Rules bargaining for any successor collective bargaining agreement.

## ARTICLE 10
## RELEASE OF INFORMATION

**Section 1**
The Parties shall make available to each other's duly designated representatives, upon reasonable request, any information, statistics and records relevant to negotiations or necessary for proper administration of the terms of this Agreement.

**Section 2**
The Parties agree that they will furnish sufficient information as to the relevancy of their request to negotiations or enforcement of the Agreement.

**Section 3**
The Parties agree to pay the cost incurred in the compilation of information they request, if applicable.

**Section 4**
The Employer agrees to furnish the Union one (1) copy of all future amendments and revisions to Executive Orders, Standard Operating Procedures, Departmental General Orders, Circulars and Special Orders coded for unit personnel and a copy of the revised District Personnel Manual, inclusive of all amendments once finalized and printed.

The Union will provide the Employer's Director of Labor and Employee Relations Unit a copy of its Constitution and By-laws at the signing of this Agreement.  Changes to these documents will be immediately forwarded to the Director.

The Parties agree to work together to develop improved procedures for notifying all members of the changes to Executive Orders, Standard Operating Procedures, Departmental General Orders, Circulars and Special Orders.  The Union will identify three representatives to work with Organizational Development, Corporate Communications and the Chief Information Office to develop, recommend, and monitor the improved procedures.

**Section 5**
Press releases or announcements issued by the Union will be signed, or handled as appropriate, by the Labor Committee Chairman or in his absence the Vice Chairman.  Should these officers be absent, the Acting Chairman will sign or handle press releases or announcements as appropriate.  The Acting Chairman will be the Secretary, the Treasurer or the Executive Steward.

The Chairman, Vice Chairman or Acting Chairman, upon being notified that a press release or announcement has been issued on Union letterhead paper signed by someone other than those authorized above or purported to represent the official position of the Labor Committee will, within no later than 24 hours from notification, disavow the issuance or information provided in the press conference.

## ARTICLE 11

## USE OF DEPARTMENT FACILITIES

**Section 1 - Union Meetings**
Union representatives may request the use of facilities occupied by the Metropolitan Police Department for Union meetings during-non-working hours.  Requests for the use of space must be made to the respective Commanding Officer.  The Union agrees that reasonable care will be exercised in using the space provided and that the area will be left in a clean and orderly condition.

**Section 2 - Bulletin Boards**
The Department agrees to furnish suitable space on Departmental bulletin boards for display of Union materials.  All notices posted by the Union shall be signed by a Union official.  The contents of the material must be related to the activities of the labor organization concerned, and may not contain personal attacks.  A copy of each notice shall be sent to the Department's Labor Relations Representative.  If material is posted that management believes violates this section the Commanding Officer will notify the Chief Steward.  The Chief Steward will remove the material if he agrees there is an improper posting.  The Chairman and the Executive Assistant Chief of Police will resolve any disputes regarding improper posting.

**Section 3 - Office Space**
The Department agrees to furnish to the Union a suitable location in each District or at Department Headquarters which will normally be available to the Union in connection with the handling of employee grievances and complaints.  If that area, however, is not then available, a like area will be made available.

**Section 4**
With specific approval by the Commanding Officer, the Union may utilize Departmental mailboxes, teletype, and electronic mail.


## ARTICLE 12
## DISCIPLINE

**Section 1**
1.      (a)  The parties agree that discipline is a management right that has not been abridged except as specifically outlined in this Article.

        (b)  Discipline may be imposed only for cause, as authorized in D.C. Official Code § 1-616.51.

2.      Any employee who is engaged in either investigating or proposing corrective or adverse action on behalf of management shall maintain the appropriate confidentiality of an investigation.

**Section 2**
1.      Corrective Action – A PD 750, a letter of prejudice, and an official reprimand.

2.      Adverse Action – any fine, suspension, removal from service, or any reduction of rank or pay of any employee who is not serving a probationary period.

## Section 3
An employee against whom corrective action is taken has the right to contest the action through Step 2 of the Grievance Procedure, beginning at the appropriate step and such action will not be subject to further appeal nor arbitration.

## Section 4
The Chief of Police or his/her designee shall take adverse action after providing the employee with written notification of the charges and proposed action and after providing the employee with fifteen (15) business days to submit a written response to the charges.  In the event the Department proposes termination, the employee shall have twenty-one (21) business days to submit his/her response.  In his/her response, the employee shall also indicate whether he/she desires a Departmental hearing.

## Section 5
If the employee elects to have a Departmental hearing, he/she shall be entitled to be represented by an attorney licensed to practice in the District of Columbia or by a Union representative.

## Section 6
The employee shall be given a written decision and the reasons therefore no later than fifty-five (55) business days after the date the employee is notified in writing of the charges or the date the employee elects to have a departmental hearing, where applicable, except that:

        (a)  when an employee requests and is granted a postponement or continuance of a scheduled hearing, the fifty-five (55) business day time limit shall be extended by the length of the delay or continuance, as well as the number of days consumed by the hearing;

        (b)  when the employee requests and is granted an extension of the time allotted for answering the notice of proposed action, the fifty-five (55) business day time limit shall be extended by the length of the extension of time; and

        (c)  when an employee or management requests a 30-business day automatic extension, the fifty-five (55) business day time limit shall be extended by that 30-business day extension of time.

## Section 7
The employee shall be given fifteen (15) business days advance notice in writing prior to the taking of adverse action.  Upon receipt of this notice, the employee may within ten (10) business days appeal the action to the Chief of Police.  The Chief of Police shall respond to the employee's appeal within fifteen (15) business days.  In cases in which a timely appeal is filed, the adverse action shall not be taken until the Chief of Police has replied to the appeal.  The reply of the Chief of Police will be the final agency action on the adverse action.

**Section 8**
Upon receipt of the decision of the Chief of Police on adverse actions, the employee may appeal to arbitration as provided in Article 19. Employees must use the negotiated grievance procedure (NGP) for a suspension of less than ten (10) days. In cases where a Departmental hearing has been held, any further appeal shall be based solely on the record established in the Departmental hearing. In such a case, the appellate tribunal has the authority to review the evidentiary ruling of the Departmental Hearing Panel, and may take into consideration any documentary evidence which was improperly excluded from consideration by the Departmental Hearing Panel.

**Section 9**
The appeals allowed by Section 8 of this Article shall not serve to delay the effective date of the decision by the Department.

**Section 10**
If the Employer suspends an officer without pay during the resolution of a criminal indictment and the criminal indictment is dropped or in any way resolved, then the Employer agrees to return the officer to a pay status or issue notification of the charges and proposed action within thirty (30) business days of the date the indictment was either dropped or resolved. Likewise, if the Employer suspends an officer without pay after the officer has been convicted of criminal charges, the Employer agrees to either return the officer to a pay status or issue notification of the charges and proposed action within thirty (30) business days of the date it removed the officer from the pay status.

**Section 11**
Disciplinary action will not preclude an employee from participating in the promotional process. Notwithstanding the foregoing, if, after the eligibility list is formed, a final disciplinary penalty of a suspension of twenty (20) days or greater is imposed, the member need not be promoted from that list. In addition, notwithstanding the foregoing, if after the eligibility list is formed an adverse action is proposed, the promotion may be held in abeyance pending a final disposition. If the disposition is favorable to the member, or the penalty is less than a suspension of twenty (20) days, he/she shall be promoted forthwith with back pay retroactive to the date when the member would otherwise have been promoted.

**Section 12**
An employee shall be given administrative leave of up to: ten (10) hours to prepare for his/her defense against any proposed discharge or suspension of more than thirty (30) days; four (4) hours to prepare his/her defense against any proposed fine or suspension of ten (10) days through thirty (30) days; and, two (2) hours to prepare his/her defense against any proposed fine or suspension of less than ten (10) days. If the employee requests the assistance of a Union employee representative, the representative shall be granted official time within his/her regularly scheduled hours up to the same amount of time as the employee he/she is representing.

**Section 13**
A District or Division Commander shall attempt to resolve a disciplinary matter after a conference with an affected employee and his Union representative (unless representation is voluntarily waived by the employee) without resorting to the steps outlined elsewhere in this

Article.  If discipline is recommended by an Administrative Board or by a Commander or Director other than the one to whom the employee is permanently assigned, the Conference shall be held with the Department Disciplinary Review Officer (DDRO).  The employee, once notified and prior to the conference, may during the day-work tour review the investigative report of the incident that resulted in the proposal that is the subject of the conference.  The following conditions apply to the conference:

1.      The penalty does not exceed a fine or suspension of ten (10) days.  Transfer, reassignment, change of days off, and nontraditional penalties including, but not limited to, community service, counseling, etc. are specifically permitted under this Section;

2.      The affected officer voluntarily agrees to the penalty and waives all appeal rights after having been given an opportunity in the conference to present his/her side of the matter;

3.      Any statements made in the conference (including proposed settlement) or actual agreement shall not be used by either party as evidence or precedent in that case or any other; except that the outcome of such a conference may be considered in the future for purposes of progressive discipline.

4.      If an agreement is not reached between the affected employee and the District or Division Commander (or the DDRO, where applicable), normal disciplinary procedures shall be followed in imposing any penalty.

**Section 14**
When a member is placed in a non-contact status pending investigation of the use of deadly force, the member may remain in non-contact until the Department's investigation is completed and submitted to the U.S. Attorney's Office for presentment to a Grand Jury.  If the Department's in-house review of this investigation determines at this stage that the use of deadly force appears to be justified and reveals no other areas of concern, upon a positive recommendation from the Police and Fire Clinic regarding the Officer's physical and mental health, the Department will restore the member to a full duty status.

The Department's decision whether or not to return a member to a full duty status will not be subject to the contractual grievance procedure or any other appeal. After the Department has made the decision to return an officer to full duty status and additional information is received that would dictate a different course of action, the Department reserves the right to place that member in a non-contact status.

The decision to place an officer in a duty status at any time does not preclude the Department from conducting an administrative investigation which may result in Adverse Action.

When the Department determines to place an officer in non-contact status, the member shall not automatically be forbidden to carry his/her authorized weapon, except in the following circumstances.

1.      The member is indicted by a Grand Jury;

2.    The member has been found guilty by a trial board and recommended for termination;

3.    The Board of Surgeons recommends that the member's authorization to carry a weapon be revoked on account of mental illness and/or an emotional or psychological condition or because a physical disability makes the member's use of a weapon hazardous; and,

4.    Suspensions, except for those imposed for alleged activities carrying no demonstrated or potential threat to public safety, and disciplinary suspensions.

In all other circumstances, it shall be the Department's policy to permit an officer or sergeant to continue to carry the authorized weapon for self-protection, if he/she so requests, stating that he/she has good reason to fear injury to his/her person or property.  Permission need not be granted if the Chief of Police or his/her agent reasonably determines, based upon the particular facts and circumstances of the case, that the permission should be denied for reasons of public safety or welfare.


# ARTICLE 13
# INVESTIGATORY QUESTIONING

**Section 1**
The efficiency of the service of the Department, including internal security practices and the obligation of members to respond to questioning shall be governed by existing Departmental policies and procedures unless abridged by this Agreement.

**Section 2**
Types of Questioning:

(a)  Administrative Interview – Formal official questioning conducted by the Department to question an employee about an administrative matter.

(b)  Criminal Interview - Formal official questioning conducted by the Department to question an employee about a criminal matter, where the member has not been identified as a target.

(c)  Interrogation - Formal official questioning conducted by the Department of a member who has been, or may be, identified as a target of a criminal investigation.

**Section 3**
Where (1) an employee can reasonably expect discipline to result from an investigatory interview, or (2) the employee is the target of an administrative investigation conducted by the Employer, at the request of the employee, questioning shall be delayed for no longer than two (2) hours in order to give the employee an opportunity to consult with a Union representative.  The two-hour limit will be strictly adhered to unless management agrees that the issue is sufficiently complex and therefore requires additional time for preparation.  Where management agrees that

additional time should be granted such additional time will not exceed four (4) hours. The Department shall not intentionally mislead a member or Union representative as to the purpose of the questioning.

(a)  A member's Union representative may be present at all administrative interview sessions under this Article, but may not answer questions on behalf of the employee. The Department reserves the right to refuse a particular Union representative for good cause, and the member to be interviewed shall then name an alternate representative.

(b)  In no event may a Union representative be present during any criminal interview or interrogation.

## Section 4

1.    Prior to commencement of any interview or interrogation, members shall be informed of the type of investigation being conducted (criminal or administrative).

2.    Prior to the commencement of any administrative interview, criminal interview or interrogation, a member shall be informed of:

(a)  Whether the member is a target of the investigation, if known at that time.

(b)  The name(s) of the complainant(s) if known, unless this information would jeopardize the investigation.

(c)  The name of the Departmental official conducting the interview.  No Department official who has reason to believe that he/she may become a subject of the investigation will conduct interviews related to the investigation.  If a member raises an objection, they are entitled to note the objection without any repercussion.  Such an objection shall not delay the interview or interrogation.

(d)  The names of persons present.

(e) The name of the official authorizing the Reverse-Garrity warnings (if applicable).

(f)  The subject officer shall be provided a written copy of the Reverse-Garrity warning signed by the official that delivers the warning.

(g)  Management's failure to abide by any of the procedures listed in paragraphs a-f will not be a bar to the processing of a case or the imposition of corrective or adverse action, including termination.  This does not preclude the Union from including such failure in the defense of a subject member.

## Section 5

The questioning will take place at a reasonable time, unless the exigencies of the situation require otherwise in the judgment of the official in charge of the investigation.

14

**Section 6**
Interview and interrogation sessions will not consume unreasonable periods of time, without periodic rest periods to allow for meals and personal necessities.

**Section 7**
During interviews, members shall not be subjected to scurrilous language.

**Section 8**
If the matter under investigation involves a violation of criminal law, at the point the investigation focuses upon the member being questioned as a principal, the member shall be advised of his/her rights under the rules of criminal procedure.

**Section 9**
When, in the judgment of the Department, an administrative interview is to be recorded, all portions of the administrative interview shall be recorded with proper notations as to when rest breaks and off-the-record discussion began and ended.

If a recording device is used, a copy of the tape shall be made available to the Union at its request and at its expense if the copy is relied upon in proposing action against a member.

**Section 10**
When a member is informed that he/she is a target of an investigation, the member will, upon request, be advised if that case is on-going until that case is finally resolved or the member is served with administrative or criminal charges.

**Section 11**
No photo of a member under investigation shall be made available to the media prior to a conviction for a criminal offense or prior to a final decision by the Chief of Police in the adverse action process.

## ARTICLE 14
## TRANSFERS

**Section 1**
Employee(s) may be transferred from one Division or District to another Division or District for the efficiency of the service of the Department. The employee (s) shall be informed in writing by an official of the Department of the reason for his/her transfer, unless the transfer was initiated at the request of the employee. The reason given will entail an explanation which will elaborate on why the transfer is for the efficiency of the service. Such elaboration will not be the basis of a grievance by the transferred employee or any other employee affected unless it conflicts with Section 3 of this Article.

**Section 2**
Where possible, an employee will be given five (5) days advance notice of his/her transfer. The Department agrees that prior to the transfer of any Union official or representative, the Union shall be given a reasonable advance notice of such transfer (not less than seven (7) days) in order to provide the Union time to designate a Union officer or representative in lieu of the transferred member.

**Section 3**
Transfers or reassignments will not be used in lieu of discipline but may form part of a disciplinary action as provided under Article 12, Section 13 - Discipline, and except the Chief of Police or the acting Chief of Police may transfer a member in a review of an appeal of adverse action in lieu of any other penalty imposed. This decision by the Chief constitutes final agency adverse action which may be further contested outside the agency as provided in other applicable articles of this agreement.

## ARTICLE 15
## LEAVE

**Section 1   Funeral Leave**
Employees shall be entitled to use three (3) days, of their accrued annual leave or leave without pay (their regular scheduled day of work before the funeral, the day of and the day following the funeral) in the event of the death of a member of their immediate family. For the purpose of this article, immediate family shall mean an employee's spouse, child, parent, brother, sister, spouse's parent, brother, or sister, child's spouse, grandchild or grandparent.

**Section 2   Leave for Conventions and Union Functions**
Employee representatives, not to exceed four (4), desirous of attending conferences, luncheons or conventions of the Fraternal Order of Police shall be entitled to use their accrued annual leave or leave without pay, in accordance with the Department's established leave policy and procedures.

**Section 3   Leave for Membership Meetings**
The Department agrees to maintain a liberal leave and compensatory time policy for the
employee representatives who are desirous of attending the membership meetings of the
FOP/MPD Labor Committee.

**Section 4**
There will be no interference with outside employment when sick leave is taken for medical and
dental appointments.

**Section 5**
Employees shall be charged sick leave for time spent while on duty seeking diagnosis and/or
treatment for non duty related illnesses or injuries.

**Section 6**
The parties agree to the following timelines concerning certification of performance of duty
injuries:

1.      The department shall determine whether a member's injury or illness was sustained by
the member in the performance of duty within 30 calendar days of a claim being reported to a
supervisor.

2.      If the department fails to meet the 30-day deadline, there shall be a rebuttable
presumption that the member's injury or illness was sustained in the performance of duty.  Until
the presumption is rebutted by a finding by the department that the injury or illness was not
sustained in the performance of duty, the department shall be responsible for all treatment costs
and disability compensation pay (i.e., the department shall carry the member in a "POD" status).

3.      The member shall receive a written decision on an appeal of a non-"POD" ruling within
120 calendar days of the filing date.  Members shall provide all requested documentation with
ten (10) business days of the request.  Any documentation requested but not provided within ten
(10) business days by the member will not be considered, will not be included as part of the
record, and may not be raised in any subsequent appeal, except in the discretion of the Chief of
Police or designee.  Any delay or stay of proceedings that occurs at the request of, or as a result
of the member, shall not count towards the 120 days.

4.      If the department fails to meet the 120-day deadline, there shall be a rebuttable
presumption that the member's injury or illness was sustained in the performance of duty.  Until
the presumption is rebutted by a finding by the department that the injury or illness was not
sustained in the performance of duty, the department shall be responsible for all treatment costs
and disability compensation (i.e., the department shall carry the member in a "POD" status).

5.      The parties agree that non-performance of duty decisions shall not be subject to grievance or arbitration.  Notwithstanding any other provision of law, rule, regulation, or this agreement, the only issues that may be grieved and arbitrated under this section are whether management failed to place a member in "POD" status at the expiration of the 30-day or 120-day periods  referenced in paragraphs 2 and 4.  The parties agree that the workers compensation program for members is set by law and is not subject to appeal under this agreement.


# ARTICLE 16
# EMPLOYEE RECORDS

## Section 1 - Medical Files
An employee or his/her representative designated in writing may review his/her medical file in accordance with established Police and Fire Clinic policy and District regulations governing disclosure of such information.

## Section 2 - Official Personnel Folders
1.      The Official Personnel Folder of an employee shall be disclosed to him/her or to his/her representative, designated in writing, in the presence of a representative of the Department, in accordance with District regulations concerning the release of such information.

2.      The contents of Official Personnel Folders shall be maintained as prescribed by governing District regulations.

## Section 3
The Department, upon written request of an employee, will remove from the Personnel Folder investigative reports which, upon completion of the investigation are classified "exonerated" and/or "unfounded."  Complaints against employees that are pending Department review, or that have been classified as "exonerated" and/or "unfounded" shall not be used to support a current allegation of wrongdoing or proposed penalty against an employee.


# ARTICLE 17
# JOINT SAFETY COMMITTEE

## Section 1
The Department and the Union agree to establish a standing Joint Safety Committee which shall meet every three (3) months, or more often at the request of either party, to review safety conditions; to discuss matters of mutual interest and benefit pertaining to safety; and to make recommendations for improvement of safety conditions to the Chief of Police.

**Section 2**

The Joint Safety Committee shall consist of not more than three (3) individuals appointed by the Department, including the Agency's Risk Management official who shall serve on the Joint Safety Committee as one of the Agency's representatives, and three (3) individuals appointed by the Union, who shall be selected annually to serve on the Committee for a period of one (1) year. The Union shall notify the Chief of Police in writing of the names and work locations of their appointees and the names and work locations of a designated alternate for each standing member.

**Section 3**

A summary report of the Committee's meeting(s) shall be submitted quarterly to the Chief of Police.  If additional meetings are held, summary reports of those meetings shall also be submitted.  The recommendations of the committee, including dissenting or additional recommendations by individual committee members and or the Agency's Risk Management official, shall be submitted in writing to the Chief of Police subsequent to each meeting.

**Section 4**

The Chief of Police shall, within twenty (20) days from receipt of the recommendations of the Committee advise the Committee in writing of his/her decision on the recommendations submitted.

**Section 5**

The members of the Joint Safety Committee appointed by the Union shall be granted official time to attend meetings when they occur during regular working hours of the employees.  The Union shall notify the Department's Labor Relations Representative at least one (1) day in advance of any scheduled meeting if an alternate will attend in the absence of the appointed member.

**Section 6**

Disputes arising under this article shall not be subject to the negotiated Grievance Procedure.


# ARTICLE 18
# UNION REPRESENTATIVES ON BOARDS


The Union shall be entitled to have one voting member sit on the Uniform and Equipment Board and one permanent, non-voting, member to sit on the Use of Force Review Board and the Crash Review Board.  These members will be selected by the Union from its membership. Membership on a Board is not a full-time assignment but merely allows the member identified to attend Board meetings involving their members.  If the union-identified member on a Board violates a confidentiality agreement relative to the work of the Board, such member will be removed from the Board, in the sole discretion of management, and the removal will not be subject to grievance or appeal.  The Union will then be entitled to nominate a replacement

member for the Board subject to the approval of the Chief of Police or his designee.  The Union shall notify the Chief of Police in writing within thirty (30) days from the effective date of this Agreement of the name and work location of the individual selected by the Union to serve on the Board and the name and work location of an alternate to serve in the absence of the standing member.

# ARTICLE 19
# GRIEVANCE PROCEDURE

## A.  PURPOSE

The purpose of this Grievance Procedure is to establish an effective mechanism for the fair, expeditious and orderly adjustment of grievances.  Only an allegation that there has been a violation, misapplication or misinterpretation of the terms of this Agreement shall constitute a grievance under the provisions of this Grievance Procedure.  Grievances not alleging violations of the contract may be grieved in accordance with the internal agency grievance procedure as set forth in Chapter 16 of the DC Personnel Regulations.

## B.  PRESENTATION OF GRIEVANCES

**Section 1**
A grievance may be brought under this procedure by one or more aggrieved employees with or without Union representation.

1.     If a grievance involves all the employees in the bargaining unit, the grievance may be filed by the Union as a class grievance directly at Step 2 of the Grievance Procedure.  It is understood that grievances filed by the union as class grievances will be processed only if the issue raised by the grievance is the same to all employees involved.

2.     If a grievance involves a group of five (5) or more employees, the grievance may be filed on behalf of the group by the Union Chairman at the lowest level capable of resolving the grievance.  The grievance shall identify and be signed by at least five members of the group  and be signed by the Union Chairman and shall be in accordance with the same time limits and other requirements as if it were an individual grievance.

**Section 2**
A grievance shall not be accepted by the Department or recognized as a grievance under the terms of this Agreement unless it is presented by the employee to management at the Oral Step of this procedure not later than ten (10) business days from the date of the occurrence giving rise to the grievance or within ten (10) business days of the employee's knowledge of its occurrence, or in the case of class grievances, by the Union not later than thirty (30) business days from the date of the occurrence giving rise to the grievance or within thirty (30) business days of the Union's knowledge of its occurrence at Step 2 of the grievance.

**Section 3**

A grievance not submitted by the employee within the time limits prescribed for each step of the procedure shall be considered satisfactorily settled on the basis of the last decision received by the employee which shall not be subject to further appeal, nor shall the Union be entitled to pursue the grievance further.  A grievance not responded to by the appropriate management representative within the time limits specified at any step shall enable the employee to pursue the grievance at the next higher step of the procedure.

**Section 4**

The time limits prescribed herein may be waived by mutual agreement, in writing, by the parties thereto, but if not so waived must be strictly adhered to.


**C.    PROCEDURAL STEPS**

The parties agree that whenever a due date set forth below falls on a weekend or holiday, the due date shall be extended until the next business day.  Business days are Monday through Friday, not including weekends or regular District government holidays.

**Informal Step**

The aggrieved employee, with or without his/her Union Steward shall meet with the official at the lowest level capable of resolving the grievance, who is not a member of the certified bargaining unit, and orally discuss the grievance.  If the official lacks the authority to resolve the grievance, he/she shall refer the employee to the appropriate management official.  The official shall make a decision and orally communicate this decision to the employee within three (3) business days from the initial presentation of the grievance.

**Step 1**

**Section 1**

If the grievance is not resolved informally, the employee shall submit a written grievance to his/her Commanding Officer within seven (7) business days following the informal response. The specific written grievance presented at Step 1 shall be used solely and exclusively as the basis for all subsequent steps.  The employee shall be represented at Step 1 by his/her Steward. The written grievance at this step and all thereafter shall contain the following:

1.      A statement of the specific provision(s) of the Agreement alleged to have been violated, misapplied or misinterpreted;

2.      The manner in which the provision is purported to have been violated, misapplied or misinterpreted;

3.      The date or dates on which the alleged violation, misinterpretation or misapplication occurred;

4.      The specific remedy or adjustment sought;

5.      Authorization for the Union or other employee representative, if desired by the employee, to act as his/her representative in the grievance; and,

6.      Signature of the aggrieved employee.

If the grievance does not contain the required information, the grievant shall be notified and granted five (5) business days from the receipt of the notification to resubmit the grievance. Failure to resubmit the grievance as required within the five (5) business day period shall void the grievance.

**Section 2**
The employee's Commanding Officer shall respond in writing to this grievance within seven (7) business days of its receipt.  The written response shall contain the following:

        (a)  An affirmation or denial of the allegations made by the employee;

        (b)  An analysis of the alleged violation of the Agreement;

        (c)  The remedy or adjustment, if any, to be made; and,

        (d)  Signature of the appropriate management representative.

**Step 2**

1.      If the grievance is not resolved at Step 1, the employee shall submit a written grievance to the Chief of Police within seven (7) business days following receipt of the Commanding Officer's response.  The written grievance filed at this step need not be signed by the employee. The Chief of Police, or his/her alternate, shall respond in writing to the grievance within seven (7) business days of its receipt.

2.      Class grievance shall be submitted by the Union in writing at this step of the grievance procedure as provided for in part B, Section 1.1 of this article and shall contain the following:

        (a)  A statement of the specific provision(s) of the Agreement alleged to have been violated;

        (b)  The manner in which the provision is purported to have been violated;

        (c)  The date or dates on which the alleged violation occurred;

        (d)  The specific remedy or adjustment sought;

        (e)  A statement that the grievance involves all employees in the bargaining unit and that the issue or issues raised by the grievance are the same as to all employees involved;

(f)  Signature of the Chairman of the FOP/MPD Labor Committee; and,

(g)  The required information must be furnished in sufficient detail to identify and clarify the matter at issue which forms the basis for the grievance.  If the grievance does not contain the required information, the Chairman of the FOP/MPD Labor Committee shall be notified and granted five (5) business days from receipt of the notification to resubmit the grievance.  Failure to resubmit the grievance as required within the five (5) business day period shall void the grievance.  The Chief of Police or his/her alternate, shall respond in writing to the class grievance within twenty one (21) business days of its receipt.

## D.  GENERAL
### Section 1
The Department and the Union agree that every effort will first be made to settle the grievance within the Department and at the lowest possible level.

### Section 2
The employees in the unit and the Union shall follow the procedures set forth in this Article with respect to any grievance they may have and shall not follow any other course of action to resolve their grievances.  If either breaches this provision, the right to invoke the provisions of this Article as to the incident involved shall be forfeited.

### Section 3
The settlement of a grievance prior to arbitration shall not constitute a precedent in the settlement of grievances.

### Section 4
The fact that a grievance is raised by an employee, regardless of its ultimate disposition, shall not be recorded in the employee's personnel file or in any file or record utilized in the promotion process; nor shall such fact be used in any recommendation for job placement; nor shall an employee be placed in jeopardy or be subject to reprisal for having followed this Grievance Procedure.

### Section 5
If an employee is given a directive by a supervisory authority which he/she believes to be in conflict with the provisions of this Agreement, the employee shall comply with the directive at the time it is given and thereafter exercise his/her right to grieve the matter.  The employee's compliance with such a directive will not prejudice the employee's right to file a grievance, nor will his/her compliance affect the resolution of the grievance.

### Section 6
The presentation and discussion of grievances provided for in this Article shall be conducted at a time and place which will afford a fair and reasonable opportunity for all persons, including witnesses, to attend. No witnesses shall be heard unless their relevancy to the case has been established. Such witnesses shall be present only for the time necessary for them to present personal testimony.  When the presentation and discussion of grievances or hearing as provided for in this procedure are held during the normal working hours of the participants, all employees

who are entitled to be present shall be excused with pay for that purpose.

**Section 7**
No recording device shall be utilized during any step of this procedure.  No person shall be present at any step for the purpose of recording the discussion.

**E. ARBITRATION**
**Section 1**
The parties agree that arbitration is the method of resolving grievances which have not been satisfactorily resolved pursuant to the Grievance Procedure and is the agreed to method of appealing adverse actions, where the penalty exceeds five (5) days, as defined in Article 12 (Discipline).

**Section 2**
Within fifteen (15) business days of the decision of the Chief of Police on an adverse action or grievance, the Union, on behalf of an employee or employees, may advise the Chief of Police in writing, signed by the aggrieved employee, of its demand for arbitration or request to utilize the Grievance Mediation procedure.  The parties agree to meet at least once in a last attempt at conciliation.  Should conciliation fail to settle the dispute, the parties will attempt to agree on a statement of the issue for submission to arbitration/mediation.  If the parties are unable to agree on a joint statement of the issue the arbitrator/mediator shall be free to determine the issue.

**Section 3**
If the Department believes the issue is not arbitrable and the Union disagrees or if agreement cannot be reached on a joint stipulation of the issue, each party shall submit its own statement of the issue to arbitration and the arbitrator will rule on arbitrability as a threshold issue before proceeding to a hearing on the merits. The arbitrator shall be selected by the parties from a panel or panels submitted by the Federal Mediation and Conciliation Service in accordance with that Service's procedures.

**Section 4**
Submissions to arbitration shall be made within ten (10) business days from any attempt at conciliation.

**Section 5**
1.      The arbitrator shall hear and decide only one grievance or appeal in each case.

2.      The parties to the grievance or appeal shall not be permitted to assert in such arbitration proceedings any ground or to rely on any evidence not previously disclosed to the other party.

3.      The hearing on the grievance or appeal shall be informal and the rules of evidence shall not apply.  The hearing shall not be open to the public or persons not immediately involved unless all parties to the same agree.  All parties shall have the right at their own expense to legal and/or stenographic assistance at this hearing.

4.      The arbitrator shall not have the power to add to, subtract from or modify the provisions of this Agreement in arriving at a decision of the issue presented and shall confine his decision solely to the precise issue submitted for arbitration.

5.   Arbitration awards shall not be made retroactive beyond the date of   the occurrence of the event upon which the grievance or appeal is based.

6.      The arbitrator shall render his/her decision in writing, setting forth his/her opinion and conclusions on the issues submitted, within thirty (30) days after the conclusion of the hearing. The decision of the arbitrator shall be binding upon both parties and all employees during the life of this Agreement.

7.      A statement of the arbitrator's fee and expenses shall accompany the award.  The fee and expense of the arbitrator shall be borne by the losing party, which shall be determined by the Arbitrator.

**Section 6**
Either party may file an appeal from an arbitration award to the PERB, not later than twenty (20) days after the award is served for reasons which show that:

1.      The arbitrator was without authority or exceeded the jurisdiction granted;

2.      The award on its face is contrary to law and public policy; or

3.      Was procured by fraud, collusion or other similar and unlawful means.

Arbitrator invoices will be paid promptly.  However, if the award is ultimately overturned and the losing party changes, the losing party shall reimburse the other party.

**Section 7**
In lieu of the arbitration procedures in this article, the parties may by mutual agreement, refer a particular grievance to expedited arbitration.  The parties shall meet and select an arbitrator from the list of approved arbitrators.  The hearing shall be conducted as soon as possible and shall be informal in nature.  There shall be no briefs, no official transcript, no formal Rules of Evidence and the arbitrator shall issue a decision within five (5) days after the close of the hearing.  The decision is binding on the parties.

## ARTICLE 20
## SPECIAL ASSIGNMENTS

Special Assignment vacancies shall be posted and shall be filled in accordance with applicable Department orders. However, the Department shall have the authority to assign members to the Executive Protection Unit and the Office of Professional Responsibility as the Chief of Police or his/her designee deems appropriate.  The decision by the Chief or his/her designee will not be considered a violation of this Article.  The Union agrees that it will not initiate any grievances as a result of the Department's decision not to advertise special assignment positions associated with the Executive Protection Unit and the Office of Professional Responsibility.

## ARTICLE 21
## FUNERAL EXPENSES

The Department will process all paperwork for a member who dies in the line of duty and will defray funeral expenses the Department determines to be reasonable.

## ARTICLE 22
## VOLUNTARY CHANGES IN SHIFTS AND DAYS OFF

Subject to management approval, employees will be allowed to exchange shifts and/or days off provided:

1.    The change does not result in overtime or violation of the basic work week;

2.    The change is between employees in the same classification and Police District; and,

3.    The exchange is limited to five (5) times per calendar year.

## ARTICLE 23
## TARDINESS

**Section 1**
The parties agree that members of the unit shall be punctual in reporting for all duty assignments.

**Section 2**
Each instance of tardiness shall be recorded in members' personnel folders regardless of any reason for reporting after the time due.  These reports shall be removed from the personnel folder one year from the date of the tardiness.

**Section 3**
In each instance of tardiness the member shall be charged hour for hour leave without pay. The minimum charge of leave without pay shall be one (1) hour during which time the member shall not be required to assume his assignment.

**Section 4**
Disciplinary action will be taken against any member who reports late more than six (6) times within a one (1) year period or who is absent without leave for more than four (4) hours.

**Section 5**
Those instances wherein a member is on duty and is late or fails to appear for an assignment shall be considered derelictions of duty and as such, discipline may be administered as provided for in Article 12 of the Agreement.

**Section 6**
The Department's current call-in leave procedure shall remain in effect.

# ARTICLE 24
# SCHEDULING

**Section 1**
Each member of the Bargaining Unit will be assigned days off and tours of duty that are either fixed or rotated on a known regular schedule. Schedules shall be posted in a fixed and known location. Notice of any changes to their days off or tours of duty shall be made fourteen (14) days in advance. If notice is not given of changes fourteen (14) days in advance the member shall be paid, at his or her option, overtime pay or compensatory time at the rate of time and one half, in accordance with the provisions of the Fair Labor Standards Act. The notice requirement is waived for those members assigned to the Executive Protection Unit and the Office of Professional Responsibility.

**Section 2**
The Chief or his/her designee may suspend Section 1 on a Department wide basis or in an operational unit for a declared emergency, for crime, or for an unanticipated event.

**Section 3**
Changes in scheduled days off will not be used for discipline except as provided in Article 12, Section 13 of this Agreement.

**Section 4**
Shift changes during a scheduled period made voluntarily at the request of an officer and upon approval of the Employer shall not require additional compensation.

## ARTICLE 25
## SENIORITY

Where objective considerations are equal, seniority shall be used as the tie breaker in assigning days off, vacations, and special assignments as defined in the applicable General Order. "Objective considerations" include, but are not limited to such matters as: ability; skill; and qualifications for an assignment; and, suitability and availability of other qualified members of the bargaining unit in the case of days off-and vacations.  Seniority is defined as time in grade for Sergeants, Technicians, and Officers (including D-ls and D-2s and Master Patrol Officers).  For those receiving tech pay (including D-l's and D-2's), seniority is defined as time in the position carrying tech pay. In the event two or more Officers have the same time in grade, the tie breakers shall be applied in the following order:

1.      time on the Department (continuous service to include all time served in the Department minus any break in service three years or less);

2.      rank on promotion list; and

3.      last four digits of employee's social security number with the lower number prevailing.

Any member who resigned and was rehired within one (1) year shall have his/her seniority computed by deducting the time lost due to his/her resignation.

This Article also does not prohibit a Commander from establishing a schedule that allows the partnering of experienced officers with less experienced officers on any tour of duty.


## ARTICLE 26
## TEMPORARY DETAILS AND ACTING PAY

**Section 1**
When the Department temporarily details a member and when the member returns to his/her original unit, the member shall be reassigned to his/her original position, if it still exists, or a comparable  assignment if the original position no longer exists, and days off.

**Section 2**
An employee detailed or assigned to a position carrying additional compensation for more than 90 consecutive days shall receive the higher rate of pay beginning the first full pay period following the 90 day period.

**Section 3**
Management shall take measures to ensure that an employee assigned or detailed to a higher graded position is not arbitrarily removed from the detail and then reinstated to the detail in order to avoid acting pay in accordance with Section 2 above.

**Section 4**
Details or assignments to a higher graded position shall not be used as a pre-selection device for permanently filling the position.  The permanent filling of the position shall be made in accordance with existing selection procedures.

**Section 5**
A report will be submitted twice a year, on January 1 and June 1, respectively, to the Union identifying by name and assignment those bargaining unit employees detailed to special assignment positions as designated by General Order 201.4.

**Section 6**
Nothing in this Article will preclude the Department and the Union from mutually agreeing to waive these provisions for unusual circumstances.

**Section 7**
Upon selection of an employee for a detail to a higher graded position, the selecting official shall issue a written justification to the record for the selection.  The justification shall not be subject to an appeal or grievance.


## ARTICLE 27
## PERFORMANCE EVALUATION

The existing General Order 201.20, Performance Rating Plan, shall remain in effect unless the Department provides the Union with notice of any proposed change(s).


## ARTICLE 28
## POLYGRAPH EXAMINATIONS

Refusal to take a polygraph examination will not be a basis for disciplinary action.


## ARTICLE 29
## BLOOD DONATION

Unit members donating blood to the American Red Cross during work time will be allowed up to five (5) hours administrative leave.

## ARTICLE 30
## OVERTIME/COMPENSATORY TIME

**Section 1**
Except as provided in Section 2 of this Article, entitlement to and computation of overtime shall be determined in accordance with, and shall not exceed, the overtime provisions of section 7 of the Fair Labor Standards Act of 1938 (FLSA) as amended, 29 U.S.C. § 207.

**Section 2**
Scheduled leave shall count towards a member's 171-hour threshold established by the FLSA. Scheduled leave is only annual, restored, District of Columbia compensatory, or FLSA leave that is submitted to the member's lieutenant at least forty-eight (48) hours in advance of the shift the leave would commence.  Any other type of leave shall not constitute scheduled leave.

**Section 3**
Leave requests not affirmatively approved shall be deemed denied.  Notwithstanding any other provision of law, rule, regulation, or this agreement, a member's failure to submit a leave request at least forty-eight (48) hours in advance of the shift the leave would commence shall not be the subject of grievance, arbitration, or litigation.

## ARTICLE 31
## DENTAL INSURANCE

**Section 1**
As of Fiscal Year 2004, the Employer agrees to contribute no more than $13.84 per month as the premium for self coverage and $29.67 per month for the premium for family coverage in an approved dental plan; and increase the contributions on October 1 of each successive year of the agreement by the same percentage as the CPI-W for the Washington Metropolitan Area published by the Bureau of Labor Statistics, United States Department of Labor, for the preceding year.

**Section 2**
The Plan shall be contracted for by the labor organization subject to a competitive bidding process where bidders are evaluated and selected by the Union.  The District may present a proposed contract which shall be evaluated on the same basis as other bidders. The contract shall provide that the Employer will be held harmless from any liability arising out of implementation and administration of the Plan by the benefit provider, that the benefit provider will supply utilization statistics to the Employer and the FOP upon request for each year of the contract, and that the benefit provider shall bear all administrative costs.

**Section 3**
To be selected for a contract, a first time benefit provider must maintain an office in the District of Columbia; be incorporated in the District and pay a franchise tax and other applicable taxes; have service providers in the District; and maintain a District bank account.

**Section 4**

The provisions of this Article shall become effective upon the date of Council approval of this Agreement (or passage of sixty (60) days after submission to the Council without action being taken thereon).

**Section 5**

The parties shall meet to develop procedures to implement these benefit programs, which shall be binding upon the benefit provider. The procedures shall include an enrollment process, and coordination of benefits in a form that is customary in the health care industry. The benefit provider for dental services shall be responsible for identifying to the Employer, after enrollment, the names and number of employees to be carried under single and family status. The Employer shall not make dual premium payments for employees who are married and are both in the bargaining unit.

**ARTICLE 32**
**OPTICAL INSURANCE**

**Section 1**

As of Fiscal Year 2004, the Employer agrees to contribute no more than $9.72 per month as the premium for each member in an approved optical plan; and increase the contribution on October 1 of each successive year of the agreement by the CPI-W for the Washington Metropolitan Area published by the Bureau of Labor Statistics, United States Department of Labor, for the preceding year.

**Section 2**

The Plan shall be contracted for by the labor organization subject to a competitive bidding process where bidders are evaluated and selected by the Union. The District may present a proposed contract, which will be evaluated on the same basis as other bidders. The contract shall provide that the Employer will be held harmless from any liability arising out of the implementation and administration of the Plan by the benefit provider, that the benefit provider will supply utilization statistics to the Employer and the FOP upon request for each year of the contract, and that the benefit provider shall bear all administrative costs.

**Section 3**

The parties shall meet to develop procedures to implement these benefit programs, which shall be binding upon the benefit provider. The procedures shall include an enrollment process, and coordination of benefits in a form that is customary in the health care industry.

**Section 4**

The provisions of the Article shall become effective upon the date of Council approval of this Agreement (or passage of sixty (60) days after submission to the Council without action being taken thereon).

**Section 5**

To be selected for a contract, a first time benefit provider must maintain an office in the District

of Columbia; be incorporated in the District and pay a franchise tax and other applicable taxes; have service providers in the District; and maintain a District bank account.

# ARTICLE 33
## PREPAID LEGAL PLAN

**Section 1**

As of Fiscal Year 2004, the Employer agrees to increase the current contribution of $19.39 by the CPI-W for the Washington Metropolitan Area published by the Bureau of Labor Statistics, United States Department of Labor, for the preceding year.  The Employer agrees to increase the contribution on October 1 of each successive year of the agreement by the same percentage as the CPI-W for the Washington Metropolitan Area published by the Bureau of Labor Statistics, United States Department of Labor, for the preceding year.

**Section 2**

The Plan shall be contracted for by the labor organization subject  to a competitive bidding process where bidders are evaluated and selected by the Union.  The District may present a proposed contract which shall be evaluated on the same basis as other bidders.  The contract shall provide that the Employer will be held harmless from any liability arising out of the implementation and administration of the plan by the benefit provider, that the benefit provider will supply utilization statistics to the Employer and the FOP upon request for each year of the contract, and that the benefit provider shall bear all administrative costs.

**Section 3**

The parties shall meet to develop procedures to implement these benefit programs which shall be binding upon the benefit provider.  The procedure shall include an enrollment process.

**Section 4**

The provisions of this Article shall become effective upon the date of Council approval of this Agreement (or passage of sixty (60) days after submission to the Council without action being taken thereon).

**Section 5**

To be selected for a contract the benefit provider must maintain an office in the District of Columbia; be incorporated in the District and pay a franchise tax and other applicable taxes; have service providers in the District; and maintain a District bank account.

# ARTICLE 34
# HEALTH

The City shall continue to pay the maximum amount allowable  contribution of health premiums pursuant to Federal law for both single and family coverage.

# ARTICLE 35
# WAGES

**Section 1: Fiscal Year 2004**
The basic salaries for all members of the bargaining unit who achieve Satisfactory or above performance, as defined by the applicable General Order, shall be increased by 4.0% for FY 2004, retroactive to the first pay period on or after October 1, 2003.

**Section 2:  Fiscal Year 2005**
The basic salaries for all members of the bargaining unit who achieve Satisfactory or above performance, as defined by the applicable General Order, shall be increased by 2.0%, effective the first pay period on or after October 1, 2004 and by 2.0%, effective the first pay period on or after April 1, 2005.

**Section 3:  Fiscal Year 2006**
The basic salaries for all members of the bargaining unit who achieve Satisfactory or above performance, as defined by the applicable General Order, shall be increased by 4.0%, effective the first pay period on or after October 1, 2005.

**Section 4:  Fiscal Year 2007**
The basic salaries for all members of the bargaining unit who achieve Satisfactory or above performance, as defined by the applicable General Order, shall be increased by 4.0%, effective the first pay period on or after October 1, 2006.

**Section 5:  Fiscal Year 2008**
The basic salaries for all members of the bargaining unit who achieve Satisfactory or above performance, as defined by the applicable General Order, shall be increased by 5.0%, effective the first pay period on or after October 1, 2007.

The existing salary/step schedule shall continue.

**Section 6: Compensation and Classification Review/PSA Incentive**
During FY 2005, the parties agree to establish a joint labor-management committee on compensation and classification reform for the purpose of reviewing the current pay progression structure applicable to bargaining unit employees and to develop recommendations for changes to the pay progression structure, to the extent necessary.  This committee will also address pay incentives for the most effective PSA teams based on criteria identified by the committee.  Crime reduction and crime solving will be two main criteria.

In addition, the Department shall set aside an amount not greater than one percent (1.0%) of the total Compensation Unit 3 payroll as of December 31, 2004, which shall be used to fund increases in salaries or make other pay adjustments for employees in Compensation Unit 3 who occupy positions for which the rate of pay is changed because of the implementation of pay progression changes recommended by the joint labor management committee.  Pay adjustments will take priority over the PSA incentives and 75% of the set aside amount will be allocated to fund the pay adjustments.  The funds set aside in Fiscal Year 2006 shall be expended or obligated prior to September 30, 2006.

## ARTICLE 36
## RETENTION DIFFERENTIALS

**Section 1**
Each bargaining unit member in active service on or after the effective date of this Article who has completed, or completes, 20 years of service under the Police Service salary schedule shall receive, per annum, a five percent (5%) base retention differential computed on his/her rate of pay prescribed in the Police Salary schedule.  A bargaining unit member is entitled to receive the BRD only as long as he/she is in active service.  The BRD shall be considered basic pay for the purposes of retirement, life insurance and other forms of premium pay.  The BRD shall be paid in the same manner as basic pay and shall be subject to the same withholding and deductions as basic pay.

**Section 2**
The Employer shall pay each and every member of the bargaining unit at the completion of his/her probationary period a four and two tenths percent (4.2%) retention allowance computed on his/her adjusted rate of pay prescribed in the Police Service salary schedule.  The retention allowance shall be considered basic pay for the purposes of retirement, life insurance and other forms of premium pay.  The retention allowance shall be paid in the same manner as basic pay and shall be subject to the same withholding and deductions as basic pay.

## ARTICLE 37
## SHIFT DIFFERENTIAL

All employees covered by this agreement are entitled to pay at their scheduled rate plus a differential of 3% for regularly scheduled non overtime work when the majority of their work hours occur between 3 p.m. and midnight; 4% of their scheduled rate if the majority of their work hours occur between 11 p.m. and 8 a.m.

## ARTICLE 38
## TECH PAY AND OTHER CURRENT SPECIAL DUTY AND SKILL PREMIUMS

Effective the first pay period on or after October 1, 2003, Tech Pay will be $1,500 per year.

Special duty and skill premium pay shall be $3,000.

## ARTICLE 39
## UNIFORM AND CLOTHING ALLOWANCE

**Section 1**
The clothing allowance for Officers and Detectives assigned to plain clothes shall be $900.00 per year, payable in two payments no later than April 15 and October 15 of each year.  The clothing allowance for casual clothes Officers shall be $450.00 per year, also payable twice yearly in April and October.

**Section 2**
Eligibility shall be based solely on the unit or position to which the member is assigned or detailed.

## ARTICLE 40
## DISTRIBUTION OF AGREEMENT

**Section 1**
A printed copy of this Agreement and any supplemental Agreement reached hereunder shall be furnished by the Employer to all affected employees within 90 business days of approval of the Agreement or supplemental Agreement by the City Council where appropriate.  The copy shall contain an alphabetical index.  It shall also contain as an addendum to the contract an unofficial complete pay schedule for both ranks in the bargaining unit.  If the Employer has not produced the agreed upon printed copies of the Agreement within 90 business days of approval of the Agreement or supplemental Agreement by the City Council where appropriate, the Union, after notifying management of its intent, may produce the printed copies unless management demonstrates that the reproduction of the Agreement is imminent.  It is agreed that the cost of printing this Agreement shall be shared equally by the parties.

Section 2
The Union Chairman or his/her designee shall be given an opportunity to meet with all new employees in the unit for one hour during the orientation session. The Employee agrees to furnish copies of this Agreement to all new employees.

## ARTICLE 41
## ADMINISTRATIVE LEAVE FOR OFF DUTY JOB RELATED ACTIVITIES

Administrative leave is an excused absence with full pay and benefits that is not charged to annual leave, sick leave, or leave without pay.

Administrative leave will be granted to employees participating in events related to his or her duties as a police officer, provided approval for such participation is granted in advance in accordance with Departmental orders.

In accordance with District Personnel Manual Instruction No. 11B-21, Item 3, Section (d) (2), dated March 12, 1997, and Special Order, Subject: Overtime Compensation, dated March 28, 1997, administrative leave will no longer be non-worked, as it will prevent a member from reaching the 171 hour threshold during the 28 day FLSA cycle.

## ARTICLE 42
## CHARITABLE CONTRIBUTIONS

The parties recognize that charitable contributions are purely voluntary in nature.

## ARTICLE 43
## PHYSICAL FITNESS

The union recognizes the Department's right to establish physical fitness standards applicable to new applicants.  With respect to current employees of the bargaining unit, the parties agree to work together to develop physical fitness standards for all members of the Department.  When the standards are developed, the parties will negotiate the impact and effects of such standards.

## ARTICLE 44
## EMPLOYEE ASSISTANCE PROGRAM

**Section 1**
The Employee Assistance Program in place when this Agreement was negotiated shall remain in effect throughout its term.

**Section 2**
As of Fiscal Year 2004, the Employer agrees to contribute no more than $12.25 per employee, per month and to increase the contribution on October 1 of each successive year of the

agreement by the same percentage as the CPI-W for the Washington Metropolitan Area published by the Bureau of Labor Statistics, United States Department of Labor, for the preceding year.

**Section 3**
Upon expiration of the existing contract, the Plan shall be contracted for by the labor organization subject to a competitive bidding process where bidders are evaluated and selected by the Union.  The District may present a proposed contract which shall be evaluated on the same basis as other bidders.  The contract shall provide that the Employer shall be held harmless from any liability arising out of the implementation and administration of the Plan by the benefit provider, that the benefit provider will supply utilization statistics to the Employer and the FOP upon request for each year of the contract, and that the benefit provider shall bear all administrative costs.

**Section 4**
The parties shall meet to develop procedures to implement these benefit programs which shall be binding upon the benefit provider. All members of the bargaining unit shall be enrolled.

**Section 5**
The provisions of this Article shall become effective upon the date of Council approval of this Agreement (or passage of sixty (60) days after submission to the Council without action being taken thereon).

**Section 6**
To be selected for a contract, the benefit provider must maintain an office in the District of Columbia; be incorporated in the District and pay a franchise tax and other applicable taxes; have service providers in the District; and maintain a District bank account.

# ARTICLE 45
## CATASTROPHIC ILLNESS/INJURY DONATION PROGRAM

The joint labor management Committee consists of three (3) members from each party whose purpose is to establish guidelines, rules and operating procedures for this Program.  The Committee is also responsible for the ongoing operation of the Program and is empowered to make revisions in the guidelines/procedures and decisions regarding the granting or denial of leave donations for both donors and recipients.

It is further agreed that where there is no majority decision within the Committee on any matter, such issue shall be submitted to the Chief of Police or his/her designee for final ruling.  It is further agreed that decisions, interpretations, and applications of this Section rendered by the Committee or the Chief of Police or his/her designee are final and binding and not subject to any grievance or appeal in any forum.  The parties agree that the Committee shall be bound by the following conceptual principles in developing implementing rules and procedures:

(a)  Potential recipients of the Program will only be considered provided medical documentation is produced supporting a claim of catastrophic illness or injury;

(b)  Recipients must have exhausted all sick leave, annual leave, compensatory leave and any advanced leave that may be advanced by the Department;

(c)  A recipient shall keep any unused portion of donated leave in his/her sick leave balance provided that such unused portion will not be used for calculating any additional retirement annuity;

(d)  Compensatory Time Leave, FLSA Leave, Restored Leave, or annual leave may be donated for this Program;

(e)  The leave identified in "d" above must be donated in four (4) hour increments;

(f)  Once donated, the leave is forfeited by the donor and is transferred to the recipient only as sick leave;

(g)  This program will only be utilized on an individual case-by-case basis.

## ARTICLE 46
## BACK PAY

The Employer shall issue to members their back pay checks within sixty (60) days from the date of the final determination that they are entitled to reimbursement.  In the event the FOP arbitrates a claim of failure to comply with this Article, an arbitrator may, if appropriate, order interest.

## ARTICLE 47
## 20-YEAR RETIREMENT

The parties agree to appoint a joint Labor/Management Committee to develop a legislative proposal that may require or authorize employees who are enrolled in the Tier 2 and Tier 3 retirement programs to transfer to a 20-year retirement program,.  The legislation will be developed in a manner that will obligate the Employees to absorb any additional expenses related to funding the improvements described therein.  If the Fiscal Impact Statement provided by the District's Chief Financial Officer reflects any negative fiscal impact to the District of Columbia, the proposed legislation shall not be forwarded to the Council of the District of Columbia for consideration.  The parties agree to split equally the cost of the actuarial study required for the Fiscal Impact Statement.

The joint committee will complete its legislative proposal no later than 180 calendar days after approval of this Collective Bargaining Agreement by the Council of the District of Columbia.  Provided, the parties may, with cause, extend this deadline.  The parties agree to submit this legislative proposal to the Mayor of the District of Columbia for submission to the Council of the District of Columbia.  The parties further agree that this legislative proposal is subject to all approvals required by District law, as well as by Federal authorities.

## ARTICLE 48
## SAVINGS CLAUSE

Should any part hereof or any provisions herein contained be rendered or declared invalid by reason of any existing or subsequently enacted legislation or by decree of a court of competent jurisdiction such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions hereof and they shall remain in full force and effect.

## ARTICLE 49
## DURATION AND FINALITY OF AGREEMENT

### Section 1
This Agreement shall remain in full force and effect until September 30, 2008, subject to the provisions of Section 1715 of the Act. If disapproved because certain provisions are asserted to be contrary to applicable law, the parties shall meet within thirty (30) days to negotiate a legally constituted replacement provision or the offensive provision shall be deleted.

### Section 2
The parties acknowledge that this contract represents the complete Agreement arrived at as a result of negotiations during which both had the unlimited right and opportunity to make demands and proposals with respect to any negotiable subject or matter. The Department and the FOP/MPD Labor Committee agree to waive the right to negotiate with respect to any subject or matter referred to or covered or not specifically referred to or covered in this Agreement for the duration of this contract.

### Section 3
In the event that a state of civil emergency is declared by the Mayor (civil disorders, natural disasters, etc.) the provisions of this Agreement may be suspended by the Mayor during the time of emergency.

### Section 4
This Agreement shall remain in effect until September 30, 2008, after approval as provided in Section 1715 of the Act, and will be automatically renewed for one (1) year periods thereafter unless either party gives to the other party written notice of intention to terminate or modify the Agreement one hundred and fifty (150) days prior to its anniversary date. In the event that either party requests modification of any Article or part of any Articles or the inclusion of additional provisions, only the related Articles or part of the Articles shall be affected and the unrelated Articles and/or parts of Articles shall continue in full force and effect.

### Section 5
All terms and conditions of employment not covered by the terms of this Agreement shall continue to be subject to the Employer's direction and control. However, when a Departmental order or regulation directly impacts on the conditions of employment of unit members, such impact shall be a proper subject of negotiation.

**Section 6**

Any and all agreements with the Employer shall be reduced to writing and signed by both parties; provided, however, that the Agreement shall not be binding upon the Labor Committee unless and until a majority of the dues paying members in good standing present and voting at a special meeting-called solely for such purpose, shall ratify such Agreement by secret ballot vote. Every agreement entered into by the Labor Committee shall contain language setting forth the above requirement for bargaining unit ratification.

## <u>SIGNATURE PAGE</u>

On this 28th day of January 2005, and in witness thereof, the parties hereto have set their
signatures.

FOR THE DISTRICT OF COLUMBIA                    FOR THE FRATERNAL ORDER OF
GOVERNMENT                                      POLICE/METROPOLITAN POLICE
                                                DEPARTMENT LABOR COMMITTEE


_____                _____
Charles H. Ramsey                               Gregory I. Greene
Chief of Police                                 Chairman, FOP


_____                _____
Michael J. Fitzgerald                           Gary Hankins
Executive Assistant Chief of Police             Chief Negotiator


_____                _____
Nola M. Joyce                                   Darrick Ross
Chief Administrative Officer                    Vice-Chairman, FOP


_____                _____
Winston Robinson, Jr.                           Gerald G. Neill
Assistant Chief, Special Services               Secretary, FOP


_____                _____
Shannon P. Cockett                              Bill Sarvis
Assistant Chief, Human Services                 Labor Consultant


_____                _____
Peter J. Newsham                                Jacqueline Barnes
Assistant Chief, Regional Operations            Labor Consultant
        Command--North


_____                _____
Terrence D. Ryan                                Pablo Figueroa
General Counsel                                 Negotiating Team Member

41

Jennifer Greene
Commander, Fifth District

Vincent Tucci
Executive Steward

Cathy L. Lanier
Commander, Special Operations Division

Thomas Sydnor
Negotiating Team Member

Brenda S. Wilmore
Director, Labor Relations Unit

Wendell Cunningham
Negotiating Team Member

Glenn C. Shearod
Inspector, Departmental Disciplinary
        Review Office

Jeff Madison
Negotiating Team Member

Marjorie V. Edmonds
Budget Director

Kris Baumann
Negotiating Team Member

Karla A. Sumpter
Payroll Manager

George Hill
Negotiating Team Member

Dean A. Aqui
Labor Relations Specialist

Chanel Dickerson
Negotiating Team Member

Mark T. Viehmeyer
Assistant General Counsel

Anthony Bingham
Negotiating Team Member

Nick Kunysz
Negotiating Team Member

_____

Eric Adgerson
Negotiating Team Member

_____

Arthur Douglas
Negotiating Team Member

_____

Kevin Pope
Negotiating Team Member

_____

Jesus Gonzales
Negotiating Team Member

## INDEX

| Subject | Page |
|---|---|
| 20-Year Retirement | 38 |
| Administrative Leave for Off Duty Job-Related Activities | 36 |
| Back Pay | 38 |
| Blood Donation | 29 |
| Catastrophic Illness/Injury Donation Program | 37 |
| Charitable Contributions | 36 |
| Dental Insurance | 30 |
| Discipline | 9 |
| Distribution of Agreement | 35 |
| Dues Checkoff | 4 |
| Duration and Finality of Agreement | 39 |
| Employee Assistance Program | 36 |

| Subject | Page |
|---|---|
| Employee Records | 18 |
| Funeral Expenses | 26 |
| Grievance Procedure | 20 |
| Health | 33 |
| Investigatory Questioning | 13 |
| Joint Safety Committee | 18 |
| Leave | 16 |
| Management Rights | 2 |
| No Strike Clause | 3 |
| Optical Insurance | 31 |
| Overtime/Compensatory Time | 30 |
| Performance Evaluation | 29 |
| Physical Fitness | 36 |
| Polygraph Examinations | 29 |
| Preamble | 1 |
| Prepaid Legal Plan | 32 |
| Probationary Officers | 2 |
| Recognition | 1 |
| Release of Information | 8 |
| Retention Differentials | 34 |
| Rights of Employees/Union Representatives | 5 |
| Savings Clause | 39 |
| Scheduling | 27 |
| Seniority | 28 |
| Shift Differential | 34 |
| Special Assignments | 26 |
| Tardiness | 26 |
| Tech Pay and Other Current Special Duty and Skill Premiums | 35 |
| Temporary Details and Acting Pay | 28 |
| Transfers | 16 |
| Uniform and Clothing Allowance | 35 |
| Union Membership | 4 |
| Union Representatives on Boards | 19 |
| Union/Employee Responsibilities | 4 |
| Use of Departmental Facilities | 9 |
| Voluntary Changes in Shifts and Days Off | 26 |
| Wages | 33 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WILFRED L. STANLEY, et al.,

       Plaintiffs,

       v.

SONYA PROCTOR, et al.,

       Defendants.

Civil Action No. 98-2780 (PLF)

**FILED**

DEC **9** 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM OPINION

On October 2, 2000, the Court heard oral argument on defendants' motions to dismiss or for summary judgment. At the conclusion of the hearing and in an order issued on October 4, 2000, the Court granted judgment for defendants with respect to Counts I (deprivation of due process property rights–defendant Sonya Proctor), III (deprivation of due process liberty interests–defendant Proctor), and IV (deprivation of due process liberty interests–defendants Metropolitan Police Department and the District of Columbia). It reserved ruling on Counts II (deprivation of due process property rights–defendants MPD and the District of Columbia), V (common law defamation–defendant Proctor), and VI (common law defamation–MPD and the District of Columbia).

With respect to Counts II, V and VI, the parties were encouraged to submit further briefs or points and authorities on the following issues: (1) whether plaintiffs must exhaust administrative remedies prior bringing these procedural due process claims under 42 U.S.C. § 1983; (2) whether the District of Columbia Comprehensive Merit Personnel Act precludes D.C. employees from filing civil suits for common law defamation; (3) whether a



*87*

municipality can be held liable under a theory of *respondeat superior* for the allegedly

defamatory remarks of one of its employees; and (4) whether the Metropolitan Police

Department is *non sui juris*. Upon consideration of the supplemental briefs addressing these

issues, the arguments of counsel at the motions hearing, and the voluminous briefing that

preceded the hearing, the Court finds that the three counts remaining in this case – Counts II, V

and VI – must be dismissed.

## I. BACKGROUND

Plaintiffs, three commanders of different districts of the Metropolitan Police

Department, claim that they were constructively terminated from their positions and that

they suffered injury from false and defamatory statements made by Interim Police Chief

Sonya Proctor to the press, to the public and to the City Council. In the three counts

remaining in this case, the officers allege that they were deprived of their Fifth Amendment

due process property rights under 42 U.S.C. § 1983 when they were constructively

discharged (Count II against defendants District of Columbia and MPD) and that they were

defamed when Chief Proctor stated that they were discharged for performance reasons

(Count V against defendant Proctor, and Count VI against defendants District of Columbia

and MPD). Plaintiffs seek reinstatement, back pay and benefits, front pay, compensatory

damages of $250,000 each, punitive damages of $750,000 each, a determination that their

due process rights were violated, an injunction against further due process violations, a fair

opportunity to clear their names, and attorneys' fees.

2

## II. SECTION 1983 DUE PROCESS CLAIM

Plaintiffs allege that Interim Police Chief Sonya Proctor terminated them without providing them with proper notice or an opportunity to be heard, thereby depriving them of their property right to continued employment without due process of law under 42 U.S.C. § 1983. The Court already has ruled that defendant Sonya Proctor enjoys qualified immunity with respect to this claim. See Order and Partial Judgment, Oct. 4, 2000 (dismissing Count I). What remains, then, is plaintiffs' Section 1983 due process claim against defendants the District of Columbia and the MPD (Count II). The District and the MPD asserted several defenses, among them that plaintiffs could not have been deprived of a property right in continued employment because an act of Congress — the Omnibus Consolidated 1997 Appropriations Act, P.L. 104-208 — had already deprived them of that right and authorized Chief Proctor to terminate them without first providing notice or showing cause. For the reasons stated in open court at the hearing on October 3, 2000, the Court rejected that defense by finding that the 1997 Appropriations Act did not trump the property rights of D.C. government employees to continued employment.[1]

---

[1]     Generally, there is no "legitimate claim of entitlement" to a particular position within the federal government. Molerio v. Federal Bureau of Investigation, 749 F.2d 815, 823 (D.C. Cir.1984) (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972) and citing MacFarlane v. Grasso, 696 F.2d 217, 221-22 (2d Cir.1982)). In the context of public employment, a property right will exist "only if the law or contract defining the employee's job expressly provides that the employee can be discharged only for cause." TRIBE, L., AMERICAN CONSTITUTIONAL LAW (2nd Ed. 1998), at 697; see Arnett v. Kennedy, 416 U.S. 134, 167, n.2 (1974) (citing Board of Regents v. Roth, 408 U.S. at 577). In the District of Columbia, however, the Police Department can remove permanent employees "only for cause." D.C. Code § 1-617.1(b); see Fox v. District of Columbia, 83 F.3d 1491, 1495 (D.C. Cir. 1996) ("Permanent career employees of the District of Columbia may be fired only for cause."). The three plaintiffs were permanent employees. Defendants argued that the D.C. Code provision and the Fox decision were overridden by Section 5204(a) of the 1997 Appropriations Act. Section 5204(a) was relied upon by the Control Board in making its delegation of authority to

The Court reserved ruling, however, on a second defense raised by the District of Columbia and the MPD, namely, that plaintiffs' due process claim must be dismissed because they failed to exhaust their administrative remedies before bringing their Section 1983 action in federal court. Specifically, on February 23, 1998, approximately nine months before this action was filed, each plaintiff appealed his alleged termination to the District of Columbia Office of Employee Appeals ("OEA"), but plaintiffs failed to obtain final decisions from the OEA before filing suit in this Court. Defendants argue that plaintiffs' due process claims therefore must be dismissed, and the Court agrees.

As a general proposition, exhaustion of state administrative remedies is not required as a prerequisite to bringing an action under Section 1983. See Patsy v. Florida Board of Regents, 457 U.S. 496, 516 (1982). There are certain exceptions to this rule, however, where exhaustion is required. Among those exceptions is the very situation presented here: when a plaintiff claims violations of procedural due process, yet has failed to take advantage of the process made available to him or her. See Burns v. Harris County Bail Bond Board, 139 F.3d 513, 519 (5th Cir. 1998) ("[A] plaintiff cannot argue that her due process rights have been violated when she has failed to utilize the state remedies available to her."); Kauth v. Hartford Ins., 852 F.2d 951, 955 (7th Cir. 1988) (plaintiff "simply cannot refuse to pursue available state remedies and then come into federal court complaining that he was not afforded due process."); Aronson v. Hall, 707 F.2d 693, 694 (2d Cir. 1983) ("Having failed to pursue available administrative review, Dr. Aronson is hardly in a position to claim that such review denied him due process."). In sum, while it is true that

---

the Interim Chief of Police, who in turn relied upon it when she allegedly terminated the three plaintiffs without due process.

4

exhaustion generally is not required before suing under Section 1983, it is required when the underlying constitutional right plaintiffs seek to enforce is procedural due process.[2]

In Alexis v. District of Columbia,, 44 F. Supp. 2d 331, 334-35 (D.D.C. 1999), a case with facts very similar to those here, nine former District of Columbia employees alleged that their due process property interest in continued employment had been violated when then Chief Financial Officer Anthony Williams summarily terminated them. Judge Urbina dismissed the due process property interest claim of one of the plaintiffs who still had a pending OEA appeal, finding that the plaintiff "was obligated to obtain an OEA Final Decision on his due process claim before seeking relief in this court. By failing to obtain a final administrative decision, the plaintiff failed to exhaust his administrative remedies." Id. at 343.

Plaintiffs' attempt to distinguish Alexis from this case is unsuccessful. Plaintiffs suggest that the holding in Alexis is limited only to individuals who have filed OEA appeals and have received an Initial Decision, but have not yet received a Final Decision. Plaintiffs reason that because they have not yet received an Initial Decision, they need not exhaust their administrative remedies as the plaintiff in Alexis was obligated to do. Plaintiffs read more into Judge Urbina's opinion than is there, however, as such a

---

[2]    All but one of the cases cited by plaintiffs involve Section 1983 claims that assert the deprivation of something other than procedural due process. See Patsy v. Florida Board of Regents, 457 U.S. 496 (1982) (plaintiff alleging race and sex discrimination); Silverman v. Barry, 727 F.2d 1121 (D.C. Cir. 1984) (plaintiff asserting taking without just compensation); Ifill v. District of Columbia, 665 A.2d 185 (D.C. 1995) (plaintiff asserting First Amendment retaliation); Roache v. District of Columbia, 654 A.2d 1283 (D.C. 1995) (plaintiff alleging race discrimination); but see Tri-County Industries, Inc. v. District of Columbia, 104 F.3d 455 (D.C. Cir. 1997) (holding in dicta, and without explication, that an individual pursuing a procedural due process claim need not exhaust local administrative remedies).

5

distinction is neither stated nor implied.  Indeed, Judge Urbina's reasoning was

straightforward:  If a D.C. employee believes that he or she has been deprived of a property

interest in continued employment without due process and files an OEA complaint, that

individual must exhaust all administrative remedies prior to filing suit in federal court.

Here, each plaintiff appealed his alleged termination to the OEA prior to filing suit.

Because they failed to obtain final administrative decisions before seeking relief here, they

failed to exhaust their administrative remedies.  Plaintiffs' due process claims under 42

U.S.C. § 1983, asserted in Count II of the Compliant, therefore will be dismissed without

prejudice.[3]

### III. DEFAMATION CLAIMS

At the hearing on defendants' motions and in the subsequent Order and

Partial Judgment, the Court also reserved ruling on whether defendants should be granted

summary judgment with respect to plaintiffs' common law defamation claim against Chief

Proctor (Count V) or against defendants the District of Columbia and the MPD (Count VI).

Defendants argue that the Court must dismiss these counts because District of Columbia law

bars plaintiffs from bringing a common law defamation action in either this Court or the

---

[3]    The points and authorities offered by defendants after the motions hearing in
support of their exhaustion argument are not helpful.  By citing <u>Zinermon v. Burch</u>, 494 U.S.
113 (1989), and <u>Fox v. District of Columbia</u>, 83 F.3d 1491 (D.C. Cir. 1996), and providing only
minimal commentary, defendants appear to be offering a new defense rather than additional
support for their exhaustion argument.  <u>Zinermon</u> would apply only if defendants were asking
the Court to enter judgment on the merits of plaintiffs' claim on the theory that the available
state remedies in fact satisfy the requirements of procedural due process.  In the earlier briefing
and at the motions hearing,  defendants maintained that plaintiffs' procedural due process
claims must be dismissed for failure to exhaust, not because they are substantively satisfied by
the administrative procedures available to them.

6

Superior Court without first exhausting their remedies under the Comprehensive Merit

Personnel Act, D.C. Code §§ 1-601 *et seq.* ("CMPA"). Specifically, defendants argue that

plaintiffs' exclusive remedy for defamation lies within the District of Columbia government

and its administrative agencies under the CMPA. Defendants point specifically to Section

1-623.16(c) of the statute (2001ed.) (formerly Section 1-624.16(c)), which provides:

> The liability of the District of Columbia government under this
> subchapter . . . with respect to the injury or death of an
> employee, is exclusive and instead of all other liability of the
> District of Columbia government . . . to the employee . . . in a
> direct judicial proceeding, in a civil action, . . . .

Defendants argue that because plaintiffs, employees of the District of Columbia, claim

injury based on alleged defamation in connection with their employment, the CMPA

provides the exclusive remedy.

Plaintiffs assert that they are not required to exhaust remedies under the

CMPA for two reasons. First, they suggest that because Chief Proctor's alleged statements

were made after plaintiffs were terminated, they technically were no longer employees of

the District of Columbia and therefore were no longer subject to the requirements of the

CMPA. As an initial matter, plaintiffs have failed to convince the Court that Chief Proctor

made any defamatory statements, much less have they established that such statements were

made after the alleged terminations. Even plaintiffs allege that such statements were made

"during the days incident to and immediately following their termination," Complaint at 5,

and that no such statement was made more than a week after termination. See id. at 4-5.

Plainly plaintiffs are claiming that the defamatory statements were made in connection with

their employment and termination; otherwise, they would not have sued the District of

Columbia and the Metropolitan Police Department for these alleged statements.

7

Second, plaintiffs claim that they need not exhaust administrative remedies because even if they were to prevail at the administrative level, the CMPA does not offer the panoply of remedies that plaintiffs seek in this case. District of Columbia case law, however, makes plain that the CMPA is the exclusive remedy regardless of the relief sought by and available to District employees. The District of Columbia Court of Appeals has consistently held that the CMPA provides District employees with a comprehensive and exclusive process for presenting employee grievances. See Baker v. District of Columbia, 785 A.2d 696, 697-98 (D.C. 2001) (CMPA is exclusive remedy for D.C. public employee; "the Superior Court is not an alternative forum . . ., but rather serves as a last resort for reviewing decisions generated by CMPA procedures"); Robinson v. District of Columbia, 748 A.2d 409, 411 (D.C. 2000) ("With few exceptions, the CMPA is the exclusive remedy for a District of Columbia public employee who has a work-related complaint of any kind."); Stockard v. Moss, 706 A.2d 561, 567 (D.C. 1997) ("[T]he CMPA provides the exclusive remedy for claims falling within its ambit."); District of Columbia v. Thompson, 593 A.2d 621, 634-36 (D.C. 1991) (dismissing plaintiff's defamation claim "for lack of subject matter jurisdiction" because "the Council intended CMPA to provide District employees with their exclusive remedies for claims arising out of employer conduct in handling personnel ratings, employee grievances, and adverse actions.").

Furthermore, the District of Columbia Court of Appeals has specifically held that the CMPA covers defamation actions brought by a District of Columbia employee against the District *and* his or her supervisor, and has held that any civil suit for common law defamation must be dismissed for lack of subject matter jurisdiction. See Baker v. District of Columbia, 785 A.2d at 698 (CMPA is exclusive remedy for litigation of

8

employee's mental distress and defamation claims); <u>Stockard v. Moss</u>, 706 A.2d at 565

(slander); <u>District of Columbia v. Thompson</u>, 593 A.2d at 634-36 (defamation). "The

[CMPA] is jurisdictional and provides the exclusive remedy for almost all claims against

public employers, with the opportunity to appeal to Superior Court." <u>Robinson v. District of</u>

<u>Columbia</u>, 748 A.2d at 411 n.4 . Plaintiffs' common law defamation claims, asserted in

Counts V and VI of the complaint therefore must be dismissed for lack of subject matter

jurisdiction.[4]

      Finally, it established that the Metropolitan Police Department would have to

be dismissed in any event because it is not suable as a separate entity; the District of

Columbia is the only proper institutional defendant. <u>See</u> <u>Kundrat v. District of Columbia</u>,

106 F. Supp. 2d 1, 5 (D.D.C. 2000); <u>Aleotti v. Baars</u>, 896 F. Supp. 1, 6 (D.D.C. 1995), <u>aff'd</u>

<u>summarily</u>, 107 F.3d 922 (D.C. Cir. 1996).

      An Order and Judgment consistent with this Memorandum Opinion shall be

issued this same day.

      SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 12/9/02

---

[4]    At the motions hearing and in their supplemental briefing, defendants also raised issues of whether Chief Proctor enjoys absolute immunity and whether defendants District of Columbia and the MPD could be held liable under a theory of *respondeat superior* for Chief Proctor's allegedly defamatory statements. Because the Court does not have jurisdiction to hear plaintiffs' defamation claims in the first instance, it need not reach these issues.