IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBIN HOEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07-00919 (JDB) |
| | ) Oral Argument Requested |
| THE DISTRICT OF COLUMBIA, | ) |
| And CATHY LANIER, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS DISTRICT OF COLUMBIA AND CATHY LANIER'S REPLY
TO PLAINTIFF'S RESPONSE TO THESE DEFENDANTS' SUPPLEMENT TO
THEIR MOTION TO DISMISS THE AMENDED COMPLAINT, AND/OR, IN
THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

Defendants, by and through counsel, herein submit a Reply to Plaintiff's

Response to their Motion to Dismiss the Amended Complaint, and/or, in the alternative,

for Summary Judgment, and state as follows:

**I.      PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT**

Plaintiff argues that he is entitled to summary judgment based on the December

14, 2007, OEA decision, and the arguments set forth in his previously filed Motion for

Summary Judgment.  See Pl.'s response at page 2.  According to the record evidence, on

July 12, 2007, plaintiff filed a partial motion for summary judgment.  See Docket Entry

#8.  On August 20, 2007, plaintiff filed his First Amended Complaint.  See Docket Entry

#14.  Because an amended complaint supersedes an original complaint, the filing of the

Amended Complaint made plaintiff's motion for summary judgment moot.  See Fed. R.

Civ. P. 15(a), which provides that a party shall plead in response to an amended

pleading…. Based on Rule 15(a)'s requirement, the District filed a new Motion for

Summary Judgment in response to plaintiff's Amended Complaint since its previously

filed motion was made moot when plaintiff amended his complaint. See Docket Entry ##

18, 19. As there is no Motion for Summary Judgment pending on behalf of plaintiff, this

Court cannot grant him the relief requested in his Response.to these defendants'

supplemental filing. See Fed. R. Civ. P. 56(a). Furthermore, as set forth below, plaintiff

is not entitled to the grant of summary judgment on the claims set forth in his Amended

Complaint.

II.    **PLAINTIFF'S CLAIM THAT HE IS A CAREER SERVICE EMPLOYEE
IS IRRELEVANT BECAUSE UNDER DISTRICT OF COLUMBIA LAW,
THE PLAINTIFF HAD NO DUE PROCESS ENTITLEMENT TO A
HEARING BEFORE HIS DEMOTION TO THE RANK OF CAPTAIN.**

Plaintiff's arguments in his Response are simple, i.e., because he is in the Career

Service, he was entitled to due process when he was demoted. Plaintiff's argument fails

to appreciate that under District law, regardless of whether he was Career[1] or Excepted

Service, he had no due process entitlement to a hearing.  Before plaintiff was demoted to

the rank of Captain, he held the at- will position of Commander as set forth under D.C.

Official Code §§ 1-608.01 (d-1) and 1-632.03(c).

Property interests are defined by existing rules or understandings that stem from

an independent source such as state law, rules or understanding that secure certain

benefits and that support claims of entitlements to those benefits. *See Board of Regents v.

Roth*, 408 U.S. 564, 5677, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)(emphasis added). Due

process scrutiny of administrative procedures is available **only** if a litigant demonstrates

that he has at stake a legitimate property or liberty interest which is subject to protection

---

[1] These defendants do not dispute that plaintiff maintained his Career Service rights as contemplated under
the CMPA up to the rank of Captain.  See Statement of Material Facts Not in Dispute.

under the Fifth or Fourteenth Amendments of the Constitution.[2] *See Mazaleski v. Treusdell*, 183 U.S.App.D.C. 182, 190, 562 F.2d 701, 709 (1977); *Pinkney v. District of Columbia*, 439 F. Supp. 519, 530 (D.D.C. 1977); *see Board of Regents v. Roth*, 408 U.S. 564, 569-70, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972). *See also Bishop v. Wood*, 426 U.S. 341, 344, 48 L. Ed. 2d 684, 96 S. Ct. 2074 (1976); *Perry v. Sindermann*, 408 U.S. 593, 601, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972). Regardless of whether plaintiff was a career service employee or excepted service employee, District of Columbia law does not confer upon plaintiff a right or entitlement to the rank of Commander. Therefore, plaintiff has no basis to challenge his demotion to the rank of captain even if the demotion was without cause.

In the District of Columbia, under D.C. Official Code § 1-608.01(d-1), the Police Chief has the explicit authority to demote members of her command staff to the rank of Captain without cause and without regard to any other law or regulation. Section 1-608.01(d-1) (emphasis added) states:

> For members of the Metropolitan Police Department and **notwithstanding § 1-632.03(1)(B) or any other law or regulation,** the Assistant and Deputy Chiefs of Police and Inspectors shall be selected from among the captains of the force and shall be returned to the rank of captain when the Mayor so determines.[3]

District Commanders are the equivalent of Deputy Chiefs. *See* Sharkey Declaration, and MPD General Order 101.9. *See* OEA Initial Decision at pg 8. The Metropolitan Police Department ceased to use the title/rank Deputy Chief and replaced the title/rank with that

---

[2] The Fourteenth Amendment is not applicable to the District and/or its employees.
[3] As indicated in the District's supplemental brief, the OEA initial decision correctly acknowledged and plaintiff does not challenge that District Commanders are the equivalent of Deputy Chiefs under D.C. Official Code § 1-608.01 (d-1). *See* MPD General Order 101.9, attached at pg 2 which was first promulgated in 1979 and continues in effect to the present, states that "District Commanders shall be of the rank of Deputy Chief". See OEA Initial Decision.

of Commander. *See* Sharkey Declaration, and Special Orders 93-11-B, 97-3-B, and

General Order 101.10 B, *See* "The Dispatch") (demonstrating the change in MPD's

organizational  structure and time line from the years 1993-2000 regarding the use of the

title/rank Deputy Chief as opposed to the title/rank Commander).  The language of D.C.

Official § 1-608.01(d-1) is reiterated and reinforced by D.C. Official Code § 1-632.03(c)

(emphasis added), which reads:

> **Notwithstanding the provisions of subsection (a)(1)(B)
> of this section, or of any other law or regulation**, for
> members of the Metropolitan Police Department, the
> Assistant and Deputy Chiefs of Police and Inspectors shall
> be selected from among the captains of the force and shall
> be returned to the rank of captain when the Mayor so
> determines as provided in § 5-105.01.

The phrase "notwithstanding . . . any other law or regulation" in §§ 1-608.01(d-1) and 1-

632.03(c) makes clear that the Police Chief's power to demote trumps all other

conflicting provisions, including D.C. Official Code § 1-617, which states that Career

Service employees have a statutory right to be discharged only for cause.  D.C. Official

Code § 1-608.01 and D.C. Official Code § 1-632.03(c) overrides all the statutory notice

and hearing requirements normally afforded to Career Service employees under the

CMPA and District Personnel Manual (DPM).[4]   As the Supreme Court has noted, "the

use of a 'notwithstanding' clause clearly signals the drafter's intention that the provisions

of the 'notwithstanding' section override conflicting provisions of any other section."

*Cisneros v. Alpine Ridge Group,* 508 U.S. 10, 18 (1993) (collecting cases); *see also*

*Shomberg v. United States*, 348 U.S. 540, 547-48 (1955) (explaining that by using

"'notwithstanding' language . . . Congress clearly manifest[s] its intent that certain

---

[4] D.C. Official Code § 1-617.1(b) cited in the OEA Initial Decision has been repealed.  The second
sentence of DPM § 1601.1 cited in the Initial Decision has also been removed.

policies should override" other provisions in a statute). The Court of Appeals for the

D.C. Circuit has interpreted similar "notwithstanding" clauses to supersede all other laws,

stating that "a clearer statement is difficult to imagine." *Liberty Maritime Corp. v.*

*United States*, 289 U.S. App. D.C. 1, 928 F.2d 413, 416 (D.C. Cir. 1991) (noting that the

'notwithstanding' clause in the Merchant Marine Act "supersede[s] all other laws").

Thus, under the "notwithstanding" clause of § 1-608.01(d-1), the Chief of Police had

broad, unrestricted and unfettered authority to return the plaintiff to the rank of Captain,

irrespective of whether he was a Career Service employee or not. *See also,* Special Order

97-4-B issued March 4, 1997, that provides that "this New Charter empowers the Chief

of Police as the agency's Chief Executive Order...this includes complete personnel

authority).

The OEA decision does not reflect or acknowledge the sweeping effect of the

"notwithstanding" clause. *See* OEA decision. Moreover, it is also a well-settled principle

of statutory construction "that a specific statute controls over a general one 'without

regard to priority of enactment.'" *Illinois Nat'l Guard v. FLRA*, 854 F.2d at 1405. As the

Supreme Court has stated:

> However inclusive may be the general language of the
> statute, it "will not be held to apply to a matter specifically
> dealt with in another part of the same enactment. . . .
> Specific terms prevail over the general in the same or
> another statute which otherwise might be controlling."

*MacEvoy v. United States*, 322 U.S. 102, 107 (1944); *D. Ginsberg & Sons, Inc. v. Popkin*,

285 U.S. 204, 208 (1932) ("Specific terms prevail over the general in the same or another

statute which otherwise might be controlling"). The more specific provisions of §§ 1-

608.01(d-1) and 1-632.03(c) prevail over the more general provisions of the CMPA. *See*

D.C. Official Code § 1-617.  Regardless of whether plaintiff is career or excepted service, he cannot demonstrate that he has a legitimate property or liberty interest in the Commander position which would be subject to protection under the Fifth Amendment of the Constitution.

The legislative history of  D.C. Official Code § 1-608.01(d-1) and D.C. Official Code § 5-105.01[5] makes it clear that the United States Congress and the Council for the District of Columbia intended for the Executive and, by delegation, the Chief of Police to have the discretion to demote command staff without procedural impediments.  This power is unique to the Chief of Police[6] and predates Home Rule and the creation of the CMPA.  In 1919, Congress passed "An Act relating to the Metropolitan Police of the District of Columbia," Chapter. 1, § 1, 41 Stat. 363 (1919), which for the first time granted the Commissioners of the District of Columbia the authority to select and demote high-ranking officials of the Department at their discretion.  The Act states:

> Par. 2.  The commissioners of said District shall appoint to office, assign to such duty or duties as they may prescribe, and promote all officers and members of said Metropolitan police force: . . .  *Provided further,* That hereafter the assistant superintendents and inspectors shall be selected from among the captains of the force and shall be returned to the rank of captain when the commissioners so determine.

---

[5] D.C. Official Code § 5-105.01, preceded D.C. Official Code § 1-608.01 and applies to police officers hired prior to January 1, 1980.  *See* D.C. Official Code §§ 1-632.03 and 1-636.02 (2001 ed.).

[6] The powers of the Chief of Police are unique, but governed by law.  No other agency director has similar powers to demote members of his or her command staff without cause, including the Chief of the Fire and Emergency Medical Services Department.  Although unique in District government, the power of the Police Chief to demote without cause is not unfamiliar among law enforcement agencies.  For similar cases in other jurisdictions, *see Bell v. Atlanta*, 258 Ga. 221, 367 S.E.2d 39 (1988) (Deputy Chief could be demoted to Major at pleasure of the commissioner); *Moore v. Otero*, 557 F.2d 435 (5th Cir. 1977) (Corporal served at the pleasure of the chief and could be demoted to patrolman); *Moon v. Atlanta*, 1982 U.S. Dist. LEXIS 10776 (N.D. Ga. 1982) (Major could be demoted to Captain at pleasure of chief of police).

*Id.* attached as Exhibit X.  "Commissioners" were replaced with "Chief of Police" and

Assistant superintendents and inspectors were above the rank of captain.

       After Home Rule, the law was amended to read:

> The Mayor of said District shall appoint to office, assign to
> such duty or duties as he may prescribe, and promote all
> officers and members of said Metropolitan Police force: . . .
> provided further, that the Assistant and Deputy Chiefs of
> Police and inspectors shall be selected from among the
> captains of the force and shall be returned to the rank of
> captain when the Mayor so determines.

See D.C. Official Code § 4-104 (1981 ed.).  Again, the discretionary command staff was

comprised of all officials above the rank of Captain—Assistant and Deputy Chiefs of

Police and Inspectors.

       In June 2000, the Council for the District of Columbia enacted The Metropolitan

Police Personnel Amendment Act of 2000, which amended D.C. Official Code §§ 1-

608.01 and § 1-632.03 to add language mirroring § 4-104 (now § 5-105.01).  These

amendments were necessary to make clear that the Police Chief had the power to promote

and demote without cause members of her command staff hired after January 1, 1980.

Under D.C. Official Code §§ 1-633.3 (now § 1-632.03) and 1-637.1 (now § 1-636.02), §

4-104 applied only to police officers hired before January 1, 1980.  The new subsections

read as follows:

> For members of the Metropolitan Police Department
> and notwithstanding section 3203(a)(2) or any other law or
> regulation, the Assistant and Deputy Chiefs of Police and
> Inspectors shall be selected from among the captains of the
> force and shall be returned to the rank of captain when the
> Mayor so determines.
>
>        * * * *

> Notwithstanding the provisions of paragraph (2) of this subsection, or of any other law or regulation, for members of the Metropolitan Police Department, the Assistant and Deputy Chiefs of Police and Inspectors shall be selected from among the captains of the force and shall be returned to the rank of captain when the Mayor so determines as provided in section 1 of An Act Relating to the Metropolitan police of the District of Columbia.

Metropolitan Police Personnel Amendment Act of 2000, D.C. Law 13-172, 47 D.C. Reg.

6308, 6333-34, attached as Exhibit Y.

The Fiscal Impact Statement to the Metropolitan Police Personnel Amendment

Act states that:

> This subtitle will have no negative fiscal impact and could have a positive impact **due to the removal of administrative costs involved in adverse action proceedings from demoting persons in positions of Inspector and above.**  Administrative costs include witness fees, staff overtime for investigative work, and materials and supplies expenses.  Enactment of this section, therefore, creates a cost avoidance from expenditure activity associated with adverse litigation.

Metropolitan Police Personnel Amendment Act of 2000, D.C. Law 13-172, 47 D.C. Reg.

6308, 6333-34, attached as Exhibit Y.  This Fiscal Impact statement makes it is clear that

the Council intended that the ranks of Inspector and above, including the rank of

Commander, be subject to demotion without cause to avoid the administrative costs of

adverse action proceedings.  There is no dispute that the Inspector and Commander

positions are above the rank of Captain.  Therefore, the OEA's Initial Decision that

Career Service Commanders may only be demoted with cause, notice, and an opportunity

to be heard is contrary to the explicitly stated intention of the Council and the long

legislative history behind §§ 1-608.01(d-1) and 5-105.01.

**III.    RES JUDICATA DOES NOT BAR THESE DEFENDANTS FROM RELITIGATING PLAINTIFF'S STATUS.**

Under 42 U.S.C. § 1983, agency decisions have preclusive effect when 1) the agency is acting in a judicial capacity and 2) the litigants had a fair opportunity to litigate all the issues. *See University of Tennessee v. Elliot*, 478 U.S. 788 (1986).  As plaintiff concedes, the OEA decision is an initial decision, and not a final judgment on the merits. *See* Opposition at 8.  Upon information and belief, a Petition for Review was filed before the OEA challenging the Initial Decision on January 18, 2008.  Therefore, the issues before the OEA continue to be litigated by the parties.  Furthermore, plaintiff fails to acknowledge that the parties did not participate in discovery in advance of the OEA's ruling.  This confirms that the issues were not fully litigated before the OEA's initial decision was issued. *See* Opposition, generally.  In fact, no depositions were taken in this matter, and the discovery process was not yet closed.  Therefore, the OEA administrative judge's findings do not preclude litigation of the issues before this Court since these defendants have not had a full and fair opportunity to litigate the issues now before this Court. *See Fonville v. District of Columbia* (EGS)Civil Action No.02-2353( EGS/JMF), 230 F.R.D. 38, 2005 U.S. Dist. LEXIS 16421 (D.D.C. July 25, 2005)(finding that an OEA administrative judge's findings did not preclude the federal court from litigating the issues concerning the "at -will" status of an MPD employee because the plaintiff did not fully litigate his alleged career status before the OEA, who declined jurisdiction).

**A.    THE OEA'S DECISION IS NOT REASONABLE, AND IS CONTRARY TO LAW.**

The OEA administrative law judge erred as a matter of law and the decision is not a reasonable interpretation of the CMPA.  *See* District's arguments set forth in its

Supplemental Memorandum of Law on that issue.  An agency's interpretation of a statute must be sustained only if the interpretation is reasonable in light of the language and purpose of the statute. *See Springer v. District of Columbia*, 743 A.2d, 1218-19 (D.C. 1999).  The OEA decision is not reasonable, as it failed to take into account the clear purpose of the statutory language and the "notwithstanding cause".  *See* OEA decision, generally, attached to Supplemental Brief.  A ruling that does not take into account the full record and/or fails to properly analyze all issues is not binding on this Court. Therefore, for all the reasons stated, the OEA Initial Decision should not be given preclusive effect in this matter.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

_____/s/ Patricia A. Jones_____
PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV

_____/s/ Leah  Taylor_____
LEAH BROWNLEE TAYLOR [488966]
Assistant Attorney General
441 Fourth St., N.W., 6th Floor South
Washington, D.C.  20001
(202) 724-7854; (202) 727-6295

# EXHIBIT H

| GENERAL ORDER | SERIES | NUMBER | EFFECTIVE DATE |
|---|---|---|---|
| | 101 | 9 | April 29, 1979 |

| SUBJECT | DISTRIBUTION |
|---|---|
| Duties and Responsibilities of Sworn Officials | A |
| | ORIGINATING UNIT |
| | PDD |

The purpose of this order is to establish the duties and responsibilities of sworn officials of the department.  This order consists of the following part:

PART I    Duties and Responsibilities of
Supervisory and Command Personnel

    A.    Assistant Chiefs of Police and
Deputy Chiefs of Police.
    B.    District Commanders.
    C.    Division Commanders and Directors.
    D.    Captains.
    E.    Lieutenants.
    F.    Sergeants.

PART I

A.    <u>Assistant Chiefs of Police and Deputy Chiefs of Police.</u>

    1.    Assistant Chiefs of Police and Deputy Chiefs of Police shall:

        a.    Perform such duties as may be assigned by the Chief of Police, and establish and maintain such records of a police nature as may be directed by the Mayor or Chief of Police.

        b.    Assure that the laws and regulations governing the department are properly observed and enforced and that discipline is maintained.

        c.    Advise the Chief of Police concerning all matters of importance and apprise him of conditions in the organizational elements under their command.

        d.    Review and forward to the Chief of Police all special reports and requests submitted by the organizational elements under their command.

        e.    Be responsible for complying with the provisions of departmental directives relative to their position.

    2.    Assistant Chiefs of Police shall be superior to Deputy Chief of Police.

    3.    This section shall pertain to District Commanders only if a particular item applies.

General Order No. 101.9
(Revised 1/01/83      )

-2-

**B.**  <u>District Commanders.</u>

District Commanders shall be of the rank of Deputy Chief and shall:

1.  Be assigned to the command of the seven patrol districts and are hereby vested with authority to:

   a.  Establish a command system which most effectively utilizes the manpower and material resources available o them and best fulfills the mission of the department;

   b.  Divide their district into parts or beats (All changes to beat boundaries must be approved by the Chief of Police);

   c.  Designate personnel who shall patrol such parts or beats; and

   d.  Assign members of their command to such duties, not inconsistent with the rules and regulations of the department, as they determine necessary.

2.  Be responsible for:

   a.  The preservation of peace, the maintenance of order, the prevention of crime, and the detection of criminals within the bounds of their district;

   b.  The enforcement of all laws, regulations, and ordinances within the purview of the police department;

   c.  The proper performance of police duty by the members of their command;

   d.  The enforcement of all rules and regulations of the department; and

   e.  The maintenance of police discipline in their district.

3.  Upon assuming command of a district:

   a.  Enter on the patrol signal system book, in their own handwriting, the date and hour of entering upon such command;

   b.  Make a careful inspection of the entire station house and adjoining police facilities and structures, and all other property under their supervision; and

   c.  Report any defects to the Chief of Police.

4.  Make or cause to be made by an official a daily inspection of the station house and adjoining police facilities and structures, all motor equipment, and all other property assigned to such district. The District Commander shall be held responsible for the cleanliness of same.

General Order No. 101.9
(Revised 1/01/93      )

-3-

5.    Requisition such supplies, work, and repairs as may be needed in their station house and adjoining police facilities and structures.

6.    Be responsible for the prudent and economical use of gas, electricity, oil, gasoline, lubricants, and all other expendable property.

7.    Be held strictly accountable for adherence on the part of the members of their command to the laws, rules, and regulations pertaining to property coming into the possession of the police.

8.    Forward to the Chief of Police daily, before 0930 hours, reports required by department orders showing the operation of their districts.

9.    Ensure that all necessary reports are properly transmitted to the Identification and Records Division, and personally bring to the attention of the Chief of Police the details of any significant or unusual event.

10.    Ensure that all general or special orders, circulars, and training bulletins pertaining to the work of the force are read at all roll calls and posted on a bulletin board for that purpose.

11.    Investigate all complaints made by citizens concerning the conduct of members of their command and process such complaints according to applicable laws, and policies and procedures of the department and/or District Government.

12.    For minor violations of department rules where corrective action is contemplated against a member, a copy of the document reflecting minor disciplinary action shall be filed as a temporary record on the left-hand side of the member's personnel folder. In cases of more serious violations, the member shall be recommended for adverse action. Only the official personnel action form reflecting the more serious adverse action shall be filed as a permanent record on the right-hand side of the member's personnel folder. Investigative reports generated as a result of violations, together with the names and statements of witnesses, shall be filed in the element's unit level adverse action file.

13.    Normally, incidents involving members of the department which require an investigation and report shall be handled in their entirety by officials of the member's assigned command except in the following:

    a.    Incidents wherein a member is involved in and arrested for a criminal offense by a member of another command.

    b.    Incidents wherein an official of another command invokes the provisions of G.O. 1202.4 due to misconduct on the part of the members.

    c.    Incidents wherein a member of another command is the victim of an unlawful act or is subjected to an act which constitutes serious misconduct on the part of another member.

General Order 101.9
(Revised 8-20-82 )

-4-

d. When officials of the member's assigned command are responsible for the investigation, but are not available for immediate response, officials from the command in which the incident occurs must proceed with the investigation.  In cases handled by officials of a command other than the involved member's, a copy of all reports and recommendations shall be forwarded to the member's commanding officer for his information, and shall be filed in the element's unit level adverse action file.

14.  Where necessary, either attend, or cause to be attended by an official of their command, inquests and hearings before a prosecutor or courts when a member of their command is involved as a defendant or a principal.

15.  In case of a major crime, an unusual incident, or disaster, immediately proceed to the scene with all available force and direct the efforts of the police in protecting property and preserving the peace.

16.  Inform the Chief of Police when it becomes evident that the regular force of a district is insufficient for the proper protection of life and property.

17.  Keep themselves informed of all meetings and similar occasions likely to attract large numbers of persons at particular places in their district, and ensure proper police service at such meetings or assemblages.

18.  Be advised by the watch commander when there is a fire within the district which necessitates his presence, and report promptly to assume command.

19.  Be responsible for the proper care and treatment of all prisoners brought to their station house and for the proper disposition of collateral received or property taken from prisoners.

20.  Except by express permission of the Mayor or the Chief of Police, permit no part of the station house or other police facilities or structures to be used for other than police business.  No person other than members of the department, those calling on police business, and those under arrest or detained shall be allowed to remain in a station house or office.

21.  Permit no person in a station house or office for the purpose of selling or offering for sale goods of any description or to solicit for any purpose whatever, nor allow the installation of any vending machine in a station house or office without permission from the Mayor or Chief of Police.

22.  Permit no posters or placards, other than those relating to or essential for police purposes, to be placed or hung in their station house, except by permission of the Chief of Police.

General Order 101.9
(Revised  8-20-82 )

-5-

23.  Permit no public property to be used for private purposes.

24.  Exercise rigid surveillance over all places where secondhand property is bought, sold, or exchanged and frequently examine, or caused to be examined, the premises where such business is conducted and the books and records required to be kept by such dealer.

25.  Exercise rigid surveillance of all public billiard and pool rooms and bowling alleys, and take prompt action in the event of any violation of the laws and regulations in the conduct of such places. They shall acquaint themselves with the sentiment of the businessmen/women and residents in the neighborhood of all pool rooms and bowling alleys in order to make knowledgeable reports on applications for licensing of such places.

26.  On Saturdays of each week, thoroughly inspect, or cause to be thoroughly inspected, revolvers in use by members of their command and insure that they are being properly cared for. The revolver of any member who is off duty on the day of inspection shall be inspected on his or her next tour of duty.

27.  Upon learning that a member of their command is unable to perform duty because of a disibility, insure that the proper police surgeon is notified, and promptly investigate and report upon any suspicious circumstances in connection with such disibility.

28.  Ensure that clearance procedures are adhered to by members separating from the department and, at the expiration of a member's last active tour of duty, that h·s revolver, holster, identification card, badge, and cap plates are surrendered.

29.  Assign or detail a member of their command for special duty in civilian dress in accordance with departmental policy.

30.  Except when it is not possible to do so, arrange the tours of duty of captains assigned to their command so that there will at all times be a captain on duty on both the evening and midnight tours of duty.

31.  Work the day tour of duty and remain on active duty until the day section is relieved.

32.  Ensure that whenever the temperature is 20 degrees or lower, at the beginning of the midnight tour of duty, those officers assigned to street duty in other than heated mobile units, patrol for only one-half of the tour of duty. For the remaining half tour officers shall be assigned either to a heated mobile unit or remain in their assigned stationhouse in order to be available for any call for police service.

C.  <u>Division Commanders and Directors.</u>

Inspectors assigned as Division Commanders or Directors shall be, governed by the provisions of this order as they apply to their particular assignment, and comply with the provisions of other departmental directives relative to their position.

<u>Captains.</u>

Captains shall:

1.   When on duty and in the absence of the Commander or Director, assume all the authority, duties, and responsibilities of such Commander or Director.

2.   On special assignments, perform such duties as are assigned them by the direction of the Chief of Police or others in authority.

3.   Attend roll call and personally inspect personnel prior to their going on duty; and permit no member to go on duty whose uniform is not in accordance with the rules of the department or who presents an unclean or untidy appearance.

4.   Visit members of their command on patrol duty as often as practicable, and take appropriate steps to correct any violation of the rules or dereliction of duty which they may observe.

5.   Visit and inspect every portion of their district at least once each week, and carefully note and take measures to correct any violations of the laws and regulations observed by them.

6.   Examine daily all books and records required to be kept in conformity with established law and the rules of the department.

7.   Examine all reports, of whatever nature, and be responsible for the accuracy and truth of their contents.

8.   Not leave the confines of their district except on police business.

9.   Be relieved of duty upon being succeeded as watch commander or upon ascertaining that all assignments for the tour of duty are completed or in the process of being completed, or have been properly transferred or suspended.

10. - Be governed by the provisions of this order as they apply to their particular assignment, and comply with the provisions of other departmental directives relative to their position.

E.   <u>Lieutenants.</u>

Lieutenants   shall:

101.9

-7-

  1.  When on duty and in the absence of the Commander or Director and Captain, assume all the authority, duties, and responsibilities of such Commander or Director.

  2.  On special assignment, perform such duties as are assigned them by the Chief of Police or others in authority.

  3.  Attend roll call.

  4.  Not leave the confines of their district without the permission of the watch commander.

  5.  Insure that the laws and regulations governing the department are observed and enforced and that discipline is maintained.

  6.  Insure that all section assignments for the tour of duty are completed, or properly transferred or suspended, before being relieved of duty.

  7.  Be governed by the provisions of this order as they apply to their assignment, and comply with the provisions of other departmental directives relative to their position.

F.  **Sergeants.**

Sergeants shall:

  1.  Familiarize themselves with the laws and regulations for the government of the department, and advise and direct the actions of those subordinate to them.

  2.  Be responsible for the preparation of roll call and insure that officers are attentive to the reading of orders, dispatches, and complaints. Additionally, they shall:

    a.  Keep a record of the names of officers who have been given warrants, subpoenas, notices, and official papers for service or attention;

    b.  At the completion of roll call, assist in the inspection of the officers; and

    c.  At the conclusion of roll call inspection, direct the officers to proceed by the nearest route to their assignments and, unless otherwise directed by a official, leave the station immediately and maintain a constant patrol in their assigned area.

-8-

3.    Instruct and assist officers under their supervision in the proper performance of their duties.

4.    Respond as often as practicable during each tour of duty on calls for police service and insure that proper police action is taken.

5.    Review for accuracy and completeness all reports submitted by officers.

6.    In the event they are unable to locate an officer on his beat or post, arrange to have the beat or post covered and then institute an immediate investigation as to the cause of the officer's absence.

7.    Comply with the directives of the department, and note and promptly report any misconduct or violation of the rules and regulations on the part of any subordinate.

8.    Be held responsible for the proper conduct and appearance of subordinates. They shall be deemed guilty of neglect of duty and inefficiency when officers under their supervision are habitually lax and indifferent in the performance of duty.

9.    Not leave the confines of their district without the permission of the watch commander.

10.    At the expiration of their tour of duty:

a.    Examine the patrol signal system book and radio run logs for accuracy and completeness, and investigate and report any discrepancies in same;

b.    Ascertain that all summonses, warrants, and notices given to officers for service have a proper disposition;

c.    Note the appearance of officers checking off duty and take appropriate remedial action when necessary; and

d.    Note in the patrol signal system book the time each officer under their supervision is relieved of duty.

11.    Insure that their assignments and those of officers under their supervision for the tour of duty are completed, or properly transferred or suspended, before being relieved of duty.

-9-

12.    Be governed by the provisions of this order as they apply to their particular assignment, and comply with the provisions of other departmental directives relative to their position.

Burtell M. Jefferson
Chief of Police

BMJ:DMS:tsj

# EXHIBIT X

# PUBLIC LAWS OF THE SIXTY-SIXTH CONGRESS

### OF THE

# UNITED STATES.

*Passed at the second session, which was begun and held at the city of Washington, in the District of Columbia, on Monday, the first day of December, 1919, and was adjourned without day on Saturday, the fifth day of June, 1920.*

WOODROW WILSON, President; THOMAS R. MARSHALL, Vice President; ALBERT B. CUMMINS, President of the Senate *pro tempore;* REED SMOOT, Acting President of the Senate *pro tempore,* January 17, April 17–20, 1920; JAMES E. WATSON, Acting President of the Senate *pro tempore,* March 11 and 12, April 6–8, 1920; CHARLES CURTIS, Acting President of the Senate *pro tempore,* March 25–30, 1920; SELDEN P. SPENCER, Acting President of the Senate *pro tempore,* May 14, 1920; THOMAS STERLING, Acting President of the Senate *pro tempore,* May 19, 1920; IRVING L. LENROOT, Acting President of the Senate *pro tempore,* May 21, 1920; FREDERICK H. GILLETT, Speaker of the House of Representatives; JOSEPH WALSH, Speaker of the House of Representatives *pro tempore,* March 11–20, 1920; PHILIP P. CAMPBELL, Speaker of the House of Representatives *pro tempore,* April 26 and 27, 1920.

---

**CHAP. 1.—An Act** To amend an Act entitled "An Act relating to the Metropolitan police of the District of Columbia," approved February 28, 1901, and for other purposes.

December 5, 1919.
[H. R. 9821.]
[Public, No. 94.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That paragraphs 2, 8, and 9 of section 1, of the Act entitled "An Act relating to the Metropolitan police of the District of Columbia," approved February 28, 1901, as amended by the Act approved June 8, 1906, entitled "An Act to amend section 1 of an Act entitled 'An Act relating to the Metropolitan police of the District of Columbia,'" approved February 28, 1901, are hereby amended to read as follows:

District of Columbia.
Metropolitan police.
Vol 31, p. 819.
Vol.34,p.221,amended.

"PAR. 2. The commissioners of said District shall appoint to office, assign to such duty or duties as they may prescribe, and promote all officers and members of said Metropolitan police force: *Provided,* That all officers, members, and civilian employees of the force, except the major and superintendent, the assistant superintendents, and the inspectors, shall hereafter be appointed and promoted in accordance with the provisions of an act entitled 'An Act to regulate and improve the civil service of the United States,' approved January 16, 1883, as amended, and the rules and regulations made in pursuance thereof, in the same manner as members of the classified civil service of the United States: *Provided further,* That hereafter the assistant superintendents and inspectors shall be selected from among the captains of the force and shall be returned to the rank of captain when the commissioners so determine: *Provided further,* That privates of class 1, if found efficient, shall serve one year on probation, privates of class 2 shall serve two years subsequent to service in class 1, and privates of class 3 shall include all those privates who have served efficiently three or more years."

Appointment of force.

Provisos.
Civil service laws to govern.
Exceptions.

Vol. 22, p. 403.

Selection of assistant superintendents and inspectors.

Privates.

"PAR. 8. That the annual basic salaries of the officers and members of the Metropolitan police of the District of Columbia shall be as follows: Major and superintendent, $4,500; assistant superintendents, $3,000 each; inspectors, $2,400 each; police surgeons, $1,600 each; captains, $2,400 each; lieutenants, $2,000 each; sergeants, $1,800 each; privates of class 3, $1,660 each; privates of class 2, $1,560 each; privates of class 1, $1,460 each. Members of said police force who may be mounted on horses, furnished and maintained by themselves, shall each receive an extra compensation of $540 per annum; and members of the said force who may be mounted on motor vehicles, furnished and maintained by themselves, shall each receive an extra

Salaries increased.
Vol.34,p.223,amended.

Mounted men.

**364**        SIXTY-SIXTH CONGRESS. Sess. II. Ch. 1. 1919.

compensation of $480 per annum; and members of the said force who may be mounted on bicycles shall each receive an extra compensation of $70 per annum: *Provided,* That patrol drivers of the Metropolitan police are hereby declared to be members of the Metropolitan police of the District of Columbia, but shall not be rated above class 2 privates, and those patrol drivers who have been appointed since April 6, 1917, shall be required to pass the usual physical and other tests required for members of the regular force: *Provided further,* That every officer or member of the Metropolitan police at the time this Act becomes law, shall, in addition to the salary received by him for his period of service between August 1, 1919, and the time this Act becomes law, receive for such period the difference between such salary and the salary payable to him under the provisions of this Act, for a period of equal duration."

"Par. 9. No member of the Metropolitan police of the District of Columbia shall be or become a member of any organization, or of an organization affiliated with another organization, which itself, or any subordinate, component or affiliated organization of which holds, claims, or uses the strike to enforce its demands. Upon sufficient proof to the Commissioners of the District of Columbia that any member of the Metropolitan police of the District of Columbia has violated the provisions of this section, it shall be the duty of the Commissioners of the District of Columbia to immediately discharge such member from the service.

"Any member of the Metropolitan police who enters into a conspiracy, combination, or agreement with the purpose of substantially interfering with or obstructing the efficient conduct or operation of the police force in the District of Columbia by a strike or other disturbance shall be guilty of a misdemeanor and upon conviction shall be punished by a fine of not more than $300 or by imprisonment of not more than six months, or by both.

"No officer or member of the said police force, under penalty of forfeiting the salary or pay which may be due him, shall withdraw or resign, except by permission of the Commissioners of the District of Columbia, unless he shall have given the major and superintendent one month's notice in writing of such intention."

Sec. 2. That one-half of the amount necessary to provide for the increased salaries and compensation of the Metropolitan police authorized in this Act is hereby appropriated out of any money in the Treasury not otherwise appropriated, and the other one-half out of the revenues of the District of Columbia, to supplement the amounts appropriated for the members and employees of the Metropolitan police mentioned in the Act entitled "An Act making appropriations to provide for the expenses of the Government of the District of Columbia for the fiscal year ending June 30, 1920, and for other purposes," approved July 11, 1919.

Sec. 3. That the watchmen provided by the United States Government for service in any of the public squares and reservations in the District of Columbia shall hereafter be known as the "United States park police," and their annual basic salaries shall be as follows: Lieutenant, $1,900; first sergeant, $1,700; sergeants, $1,580; privates, $1,360: *Provided,* That every watchman employed for such service at the time this Act becomes law shall, in addition to the salary received by him for the period of service between August 1, 1919, and the time this Act becomes law, receive for such period the difference between such salary and the salary payable to him under the provisions of this section for a period of equal duration.

Sec. 4. That to provide for the increased salaries and compensation of the United States park police, so much as is necessary is hereby appropriated, out of any money in the Treasury not otherwise appro-

*Provisos.*
**Status of patrol drivers.**

Increase allowed from August 1, 1919.

Affiliation with organizations advocating strikes, prohibited.

Discharge for violation.

Punishment for conspiracy, etc., to interfere with duties by strikes, etc.

Resignations restricted.

Appropriation for increased pay.

Half from District revenue.

*Ante,* p. 86.

Park police.
Watchmen in public squares to be so termed.

Salaries.

Increase allowed from August 1, 1919.

Appropriation for increased pay.
Vol. 40, p. 1240.
*Post,* p. 509.

priated, to supplement the amounts appropriated for park watchmen mentioned in the Act entitled "An Act making appropriations for the legislative, executive, and judicial expenses of the Government for the fiscal year ending June 30, 1920, and for other purposes," approved March 1, 1919.

Approved, December 5, 1919.

---

**CHAP. 2.**—An Act Authorizing the Chincoteague Toll Road and Bridge Company, Incorporated, a corporation created by, and existing under, the laws of the Commonwealth of Virginia, to construct certain bridges to connect Chincoteague Island and the mainland.

*December 10, 1919.*
*[S. 2961.]*
*[Public, No. 95.]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Chincoteague Toll Road and Bridge Company, Incorporated, a corporation created by, and existing under, the laws of the Commonwealth of Virginia, be, and it is hereby, authorized to construct, maintain, and operate, at points suitable to the interests of navigation, six highway bridges and approaches thereto across Mosquito Creek, Cockle Creek, Queen Sound, Wire Narrows, Black Narrows, and Chincoteague Channel for the purpose of connecting Chincoteague Island to the mainland, in accordance with the provisions of the Act entitled "An Act to regulate the construction of bridges over navigable waters," approved March 23, 1906.

Chincoteague Island, Va.
Chincoteague Toll Road and Bridge Company may connect, with mainland by bridges.

Construction.
Vol. 34, p. 84.

Sec. 2. That the right to alter, amend, or repeal this Act is hereby expressly reserved.

Amendment.

Approved, December 10, 1919.

---

**CHAP. 3.**—An Act To authorize the change of the name of the steamer Charlotte Graverset Breitung to T. K. Maher.

*December 10, 1919.*
*[H. R. 6657.]*
*[Public, No. 96.]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Commissioner of Navigation is hereby authorized and directed, upon the application of the owner, the Morrow Steamship Company, of Mentor, Lake County, Ohio, to change the name of the steamer Charlotte Graveraet Breitung, official number twenty-seven thousand six hundred and sixty-five, to the T. K. Maher.

"Charlotte Graverset Breitung," steamer.
Change of name to "T. K. Maher," authorized.

Approved, December 10, 1919.

---

**CHAP. 4.**—An Act Providing additional time for the payment of purchase money under homestead entries of lands within the former Fort Peck Indian Reservation, Montana.

*December 11, 1919.*
*[S. 183.]*
*[Public, No. 97.]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That any person who has made homestead entry under the provisions of the act of Congress approved May 30, 1908 (Thirty-fifth Statutes at Large, page 558), entitled "An Act for the survey and allotment of lands now embraced within the limits of the Fort Peck Indian Reservation, in the State of Montana, and the sale and disposal of all the surplus lands after allotment," may obtain an extension of time for one year from the anniversary of the date of entry last preceding the passage of this Act within which to pay the one-half of the installment then due or such part of any preceding installment, where payment has not been yet made and where an extension of time therefor is not authorized by the act of Congress approved March 2, 1917 (Thirty-ninth Statutes at Large, page 994), by paying interest at the rate of 5 per centum per annum on the sums to be extended from the maturity of the unpaid installments to the

Fort Peck Indian Reservation, Mont.
Time extensions for installments by homesteaders on ceded lands of.
Vol. 35, p. 561; Vol. 38, p. 1352.
Vol. 39, p. 994, amended.

Interest payments.

# EXHIBIT Y

**ENROLLED ORIGINAL**

to MPD as Other Revenue, to be used expressly for the purchase of specialty replacement vehicles, including motorcycles. Any revenue in excess of $500,000 shall revert to the General Fund.

Sec. 803. Fiscal impact statement.
Enactment of this subtitle will have no negative fiscal impact, because the MPD has had access to vehicle auction proceeds in both fiscal years 1998 and 1999, and the approximately $200,000 in estimated annual revenue from these proceeds is not included in the general fund revenue estimates for FY 2000 and FY 2001.

SUBTITLE B: OMNIBUS POLICE REFORM TECHNICAL AND CONFORMING AMENDMENTS

Sec. 811. Short title.
This subtitle may be cited as "Omnibus Police Reform Technical and Conforming Amendments Act of 2000".

Sec. 812. The Omnibus Police Reform Amendment Act of 2000, signed by the Mayor on April 24, 2000 (D.C. Act 13-334; 47 DCR 4619), is amended as follows:
(a) Section 102 is amended by striking the phrase "Lateral Appointment of Law Enforcement Officers Emergency Amendment Act of 2000" and inserting the phrase "Lateral Appointment of Law Enforcement Officers Clarifying Emergency Amendment Act of 1999" in its place both times it appears.
(b) A new subsection (a-1) is added to read as follows:
"(a-1) Metropolitan Police Officers hired after January 11, 2000, and prior to December 31, 2003, shall have successfully completed at least 60 post-secondary semester hours from an accredited university by the fifth anniversary of the date hired.".

Sec. 813. Fiscal impact statement.
Enactment of this subtitle, which includes technical amendments to conform the permanent omnibus police reform legislation with the emergency and temporary versions of the legislation, has no fiscal impact.

SUBTITLE C: POLICE PERSONNEL AMENDMENT

Sec. 821. Short title.
This subtitle may be cited as the "Metropolitan Police Personnel Amendment Act of 2000".

Sec. 822. The District of Columbia Government Comprehensive Merit Personnel Act of 1978 is amended as follows:
(a) Section 801 is amended by adding a new subsection (d-1) to read as follows:

**ENROLLED ORIGINAL**

"(d-1) For members of the Metropolitan Police Department and notwithstanding section 3203(a)(2) or any other law or regulation, the Assistant and Deputy Chiefs of Police and inspectors shall be selected from among the captains of the force and shall be returned to the rank of captain when the Mayor so determines.".

    (b) Section 3203(a) is amended as follows:

        (1) Paragraph (28) is amended by striking the word "and" at the end.

        (2) Paragraph (29) is amended by striking the period and inserting the phrase ", and" in its place.

        (3) A new paragraph (30) is added to read as follows:

        "(30) Notwithstanding the provisions of paragraph (2) of this subsection or of any other law or regulation, for members of the Metropolitan Police Department, the Assistant and Deputy Chiefs of Police and inspectors shall be selected from among the captains of the force and shall be returned to the rank of captain when the Mayor so determines as provided in section 1 of An Act Relating to the Metropolitan police of the District of Columbia.".

    Sec. 823.  Fiscal impact statement.

    This subtitle will have no negative fiscal impact and could have a positive impact due to the removal of administrative costs involved in adverse action proceedings from demoting persons in positions of Inspector and above.  Administrative costs include witness fees, staff overtime for investigative work, and materials and supplies expenses.  Enactment of this section, therefore, creates a cost avoidance from expenditure activity associated with adverse litigation.

    SUBTITLE D:  POLICE CADET PROGRAM

    Sec. 831.  Short title.

    This subtitle may be cited as the "Metropolitan Police Cadet Program Amendment Act of 2000".

    Sec. 832.  Section 2(a) of the Police Officer and Firefighter Cadet Programs Funding Authorization and Human Rights Amendment Act of 1982 is amended to read as follows:

    "(a)  The Chief of the Metropolitan Police Department shall establish a police officer cadet program, which shall include senior year high school students and young adults under the 21 years of age residing in the District of Columbia who are graduates of a high school in the District,  for the purpose of instructing, training, and exposing interested persons to the operations of the Metropolitan Police Department and the duties, tasks, and responsibilities of serving as a police officer with the Metropolitan Police Department.".

    Sec. 833.  Applicability.

    This subtitle shall apply as of October 1, 2000.

27

**OFFICE OF EMPLOYEE APPEALS**
**FOR THE DISTRICT OF COLUMBIA**

ROBIN HOEY,                        )
                                   )
            Petitioner,            )
                                   )   Case Number:  1601-0074-07
      v.                           )
                                   )   Joseph E. Lim, Esq.
METROPOLITAN POLICE                )   Senior Administrative Judge
DEPARTMENT,                        )
                                   )
            Respondent.            )
_____)

**RESPONDENT METROPOLITAN POLICE**
**DEPARTMENT'S PETITION FOR REVIEW**

The Board of the Office of Employee Appeals should grant the instant Petition for

Review and reverse the Initial Decision of the Administrative Judge as the decision:

> 1. Fails to take into consideration the "notwithstanding" clause of D.C. Official
>    Code § 1-608.01(d-1);
>
> 2. Erroneously construes the more general provisions of the Comprehensive Merit
>    Personnel Act (CMPA) to supersede the more specific provisions of § 1-608.01(d-
>    1) in violation of well-settled rules of statutory construction; and
>
> 3. Contradicts the legislative history and the expressed intent of the Council of the
>    District of Columbia in enacting § 1-608.01(d-1).

**Background**

Petitioner Robin Hoey was appointed a police officer on December 16, 1985. *Initial*

*Decision* at 2, ¶ 1. He was promoted from the rank of Lieutenant to the rank of Captain on

January 16, 2000. *Initial Decision* at 2, ¶ 2.  On April 22, 2001, Petitioner was promoted from

the rank of Captain to the rank of Inspector on January 16, 2001. *Initial Decision* at 2, ¶ 3.

Petitioner was promoted to the rank of Commander and assigned to the Sixth District on August

1, 2004. *Initial Decision* at 2, ¶ 4.

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing were mailed, postage prepaid, this 17th day of

January, 2008, to:

> J. Michael Hannon, Esq.
> Sarah Bagley, Esq.
> 1901 18th Street, N.W.
> Washington, D.C.  20009

TERESA QUON HYDEN

13

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBIN HOEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 07-00919 (JDB) |
| | ) |
| THE DISTRICT OF COLUMBIA, | ) |
| And CATHY LANIER | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF INSPECTOR CLEORA SHARKEY

I, Inspector Cleora Sharkey, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge:

1.    I am an adult over the age of 18 years old, and I am competent to provide the information herein.

2.    I am an Inspector with the D.C. Metropolitan Police Department's Office of Professional Development: Policy Development Division, located at MPD Headquarters, 300 Indiana Ave., NW, Room 5004, Washington, DC 20001.

3.    MPD General Orders and Special Orders and their attachments in the above captioned case, are internal directives issued by the Metropolitan Police Department to all members of the police force, under the authority of the Chief of Police.  Those directives are in force and effect on the date of their issue. They remain in force and effect unless or until they are rescinded or replaced with a subsequent directive from the Metropolitan Police Department.

4.      The following MPD General Orders and Special Orders were promulgated by the D.C. Metropolitan Police Department: MPD General Order 101.9, originally issued in April 29, 1979, MPD General Order 101.10 B, issued January 14, 1998, MPD General Order 110.11 B, issued July 22, 2002, Special Order 97.3 B, issued March 4, 1997, Special Order 97.4 B, issued March 4, 1997, and Special Order 93.11 B, issued June 17, 1993.

5.      The organizational charts of the MPD in the above captioned case reflect that the title "Deputy Chief" was replaced by the title "Commander".

6.      "The Dispatch" in the above captioned case, is a publication issued by the Metropolitan Police Department, which reflects events and information relevant to the Metropolitan Police Department. The January 12, 2000 issue of "The Dispatch" reflects that the title/rank "Deputy Chief" was replaced by the title/rank "Commander".

DATED  1/28/08                         Insp. Cleora W. Sharkey
                                       Inspector Cleora Sharkey

## Metropolitan Police Department □ Washington, D.C.

 **SPECIAL ORDER** 

| Subject: | | | |
|---|---|---|---|
| | **Series** 93 | **Number** 11 | **Distribution** B |
| **Interim Alignment of the MPD** | **Effective Date** June 17, 1993 | | |
| | **Expiration Date** * | | |

As you know, the organizational changes that were effected on May 30th involved the establishment of the position of "commander" for the patrol districts and the staffing of some of these positions with inspectors. (By the Fall of this year each patrol district shall be staffed with an inspector as the commander.)  As a consequence of the newly created commander position, the former commanding officers (deputy chiefs) of the patrol districts were reassigned to staff support units within the department.

Throughout the Summer and into the Fall months, as I receive the reports from the Focus Groups, we can anticipate that the structure of the department will undergo additional changes.  In that regard, effective Sunday, June 13, 1993, the Investigative Services Bureau shall be renamed the "Support Services Bureau (SSB)."  The organizational chart on the following page reflects the principal changes that shall occur as the result of the newly created SSB.

The creation of an Management Services Bureau and the relative organizational realignment associated therewith will occur later this summer.

Fred Thomas
Chief of Police

FT:SMF:jtp

**Metropolitan Police Department**
Washington, D.C.

Office of Finance &
Resource Management

Office
of the
General Counsel

OFFICE
OF THE
CHIEF OF POLICE

Internal Affairs
Division

Court Liaison
Division

Public Information &
Community Affairs Ofc.

| Patrol Services Bureau | CEP | Support Services Bureau | Administrative Services Bureau | Technical Services Bureau |
|---|---|---|---|---|
| First District | | Youth & Family Services Division | Labor Relations Division | Property Division |
| Second District | | | Disciplinary Review Division | |
| Third District | | Narcotics and Special Investigations Division | | Communications Division |
| Fourth District | | | Medical Services Division | |
| Fifth District | | Criminal Investigations Division | Human Resource Development Division | Fleet Management Division |
| Sixth District | | Reserve Corps Division | Planning and Research Division | Identification and Records Division |
| Seventh District | | | | |
| Special Operations Division | | Audit and Compliance Division | Personnel and Training | Data Processing Division |

Training
Division

Personnel
Liaison
Officer

**INTERIM ALIGNMENT**
Summer 1993

Rev. 6/93

## Metropolitan Police Department  □ Washington, D.C.



# SPECIAL ORDER



| Subject: | | Series | Number | Distribution |
|---|---|---|---|---|
| | | **97** | **3** | **B** |
| **Changes in Command Structure and Related Promotions** | | Effective Date **March 4, 1997** | | |
| | | Expiration Date * | | |

On Wednesday, February 26, 1997, several changes were made in the command structure of the department.  To coincide with these changes, a number of command level promotions were announced.  A copy of the current department organizational chart is attached for your information.

## OFFICE OF THE CHIEF OF POLICE

The Office of the Chief of Police now includes the newly created Planning and Development Division.  The Office of Professional Responsibility, formerly under the Support Services Bureau, is relocated to the Office of the Chief of Police.  The component organizational elements of the Office of the Chief are:

| | |
|---|---|
| Office of the General Counsel | Vernon S. Gill, Esq. |
| Chief Financial Officer - Office of Finance and Budget | Mr. Sidney H. Evans, Jr. |
| Chief of Staff - Office of Planning & Development | Inspector William R. Ponton |
| Office of Professional Responsibility | Inspector Lloyd Coward |
| Office of Public Information | Sergeant Joseph Gentile |

## PATROL SERVICES BUREAU

The previous Patrol Services North and Patrol Services South are eliminated.  The new Patrol Services Bureau includes all seven police districts now under the command of the Patrol Services Officer, Assistant Chief Rodney D. Monroe.

### Patrol Districts

District commanders, who previously held the rank of Inspector, have now been designated as "Commanders", and will wear the insignia formerly worn by Deputy Chiefs.  The seven district commanders are as follows:

| | |
|---|---|
| First District | Commander Alfred J. Broadbent |
| Second District | Commander Jacqueline Barnes |
| Third District | Commander Winfred L. Stanley |
| Fourth District | Commander Ronald C. Monroe |
| Fifth District | Commander Reginald L. Smith |
| Sixth District | Commander John C. Daniels |
| Seventh District | Commander Winston Robinson Jr. |

UN-12 REV. 10/95

| | Effective Date | Change Number | Page Number |
|---|---|---|---|
| Special Order 97-3 | March 4, 1997 | N/A | 2 of 2 |

## SUPPORT SERVICES BUREAU

The Support Services Bureau now includes the Youth and Family Services Division. The Support Services Bureau is now under the command of the Support Services Officer, Assistant Chief Michael J. Fitzgerald, and includes the following:

| | |
|---|---|
| Criminal Investigations Division | Inspector Glenn C. Hoppert |
| Narcotics & Special Investigations | Inspector Carolyn L. Boggs |
| Special Operations Division | Inspector Adrian D. Barnes |
| Youth & Family Services Division | Inspector Kim C. Dine |

## HUMAN RESOURCES BUREAU

The units within the Human Resources Bureau, now under the command of the Human Resources Officer, Assistant Chief Sonya T. Proctor, will remain the same and include:

| | |
|---|---|
| Training Division | Mr. Stephen Cass |
| Testing and Standards Division | Ms. Joan Weiss |
| Personnel Liaison Officer | Captain Christopher Lojacono |
| Labor Relations Division | Ms. Brenda Wilmore |
| Disciplinary Review Division | Inspector Earl Boyd |
| Medical Services Division | Inspector Jacqueline Simms |
| Court Liaison Division | Inspector Joseph Adamany |

## TECHNICAL SERVICES BUREAU

The position of Technical Services Officer is currently vacant. The Chief of Police intends to conduct a nationwide search to fill this vacancy. Currently, the divisions within the Technical Services Bureau, as listed below, will report to the Support Services Officer, who is the acting Technical Services Officer:

| | |
|---|---|
| Information Services Division | Inspector James A. Lingerfelt |
| Communications Division | Inspector Stanley E. Wigenton |
| Identification & Records Division | Mr. Tom Burse |
| Fleet Management Division | Mr. Bob Rose |
| Property Division | Inspector Abraham H. Parks |

## RESERVE CORPS

The Reserve Corps will continue to operate under the command of the Reserve Corps Commander Ron Linton, who was promoted to the rank of Assistant Chief. Chief Linton will coordinate all citizen volunteers within the department.

Larry D. Soulsby
Chief of Police

LDS:WRP:jam

Attachment

UN-11 (CONT.1) 10/95

## Metropolitan Police Department  □  Washington, D.C.



# SPECIAL ORDER



| Subject: | Series | Number | Distribution |
|---|---|---|---|
| | 97 | 4 | B |
| **Charter and Mission Statement for the Metropolitan Police Department** | Effective Date **March 4, 1997** | | |
| | Expiration Date | | |

During the past few months, the consulting firm of Booz-Allen & Hamilton has been conducting a review of the department's operations and organizational structure. While the complete report on the findings of the review will not be available for several months, initial results indicate that the department needs to re-emphasize its commitment to provide the finest police service possible to the community. To formalize this commitment, they made a recommendation that the department operate under a new Charter.

The consultants recommendation was approved by the stakeholders (M.O.U. signatories), which is made up of the Chief of Police, the Mayor, the United States Attorney for the District of Columbia, the Chief Judge of the Superior Court, the City Council, and the District of Columbia Financial Responsibility and Management Assistance Authority.

This new Charter empowers the Chief of Police as the agency's Chief Executive Officer, making him responsible and accountable for all department operations. This includes complete personnel authority, and independent budget and procurement authority. Therefore, effective immediately, the following will be the Charter of the Metropolitan Police Department.

### Charter of the
### Metropolitan Police Department

The Charter for the Office of the Chief of Police, of the Metropolitan Police Department of the District of Columbia, is to develop and execute effective strategies that prevent and reduce crime, disorder, fear of crime, and improve the quality of life for all citizens in the District of Columbia. This will be accomplished in partnership with the community, and other appropriate government agencies, and in accordance with constitutional values and applicable laws. The Chief of Police will serve as the Chief Executive Officer of the department. As such, the Chief is responsible for establishing professional standards that maintain a higher level of integrity and ethical conduct than is generally accepted of others, and will be responsible and accountable for all activities involving the Metropolitan Police Department. All operations of the department, including planning, organizing, staffing, coordinating, directing, reporting, and budgeting of department and related community resources, will be oriented toward serving the needs of a diverse community, as well as the federal interests associated with Washington's unique role as the Nation's Capital.

UN-12 REV. 10/95

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| Special Order 97-4 | March 4, 1997 | N/A | 2 of 2 |

The new Charter requires that all department activities be directed toward providing high quality police service to the community.  To this end, the Chief of Police has ordered that the current Mission Statement of the department be altered to reflect its complete commitment to this mandate.  The new Mission Statement is short and simple, but speaks volumes in its intent.  The department must operate with dignity, conduct must be professional and ethical, and its members must provide a selfless devotion to duty.  The citizens who live, work, and visit the Nation's Capital deserve nothing less; thus, nothing less will be acceptable.

Therefore, effective immediately, the following shall be the mission statement for the Metropolitan Police Department:

---

### Mission of the
### Metropolitan Police Department

The mission of the Metropolitan Police Department is to eliminate crime, fear of crime, and general disorder, while establishing respect and trust within the community.

---

In the near future, each member of the department will be provided a pocket-sized copy of the new Charter and Mission Statement.  Members are to thoroughly familiarize themselves with the Charter, and be able to repeat the Mission Statement when requested by citizens, officials, or other officers.

Larry D. Soulsby
Chief of Police

LDS:WRP:jam

UN-11 (CONT.1) 10/95

# Metropolitan Police Department □ Washington, D.C.



# GENERAL ORDER



| Subject: | Series | Number | Distribution |
|---|---|---|---|
| **Organization of The Metropolitan Police Department** | **101** | **10** | **B** |
| | Effective Date **January 14, 1998** | | |
| | Revision Date **N/A** | | |

The purpose of this order is to define the mission, organization, and functions of the Metropolitan Police Department, and to outline the responsibilities of the various elements which make up the department's organizational structure. The organizational structure and responsibilities are designed to execute the Charter of the Metropolitan Police Department and lead to the successful achievement of the department's mission. This order consists of the following parts:

| | |
|---|---|
| **PART I** | **Charter and Mission Statement of the Metropolitan Police Department** |
| **PART II** | **Administration** |
| **PART III** | **Patrol Services Bureau** |
| **PART IV** | **Support Services Bureau** |
| **PART V** | **Technical Services Bureau** |
| **PART VI** | **Human Resources Bureau** |
| **PART VII** | **Volunteer Services Bureau** |

**PART I**

## Charter of the Metropolitan Police Department

The Charter for the office of the Chief of Police, of the Metropolitan Police Department of the District of Columbia, is to develop and execute effective strategies that prevent and reduce crime, disorder, fear of crime, and improve the quality of life for all citizens in the District of Columbia. This will be accomplished in partnership with the community, and other appropriate government agencies, and in accordance with constitutional values and applicable laws. The Chief of Police will serve as the Chief Executive Officer of the department; as such, the Chief is responsible for establishing professional standards that maintain a higher level of integrity and ethical conduct than is generally accepted of others, and will be responsible and accountable for all activities involving the Metropolitan Police Department. All operations of the department, including planning, organizing, staffing, coordinating, directing, reporting, and budgeting of department and related community resources, will be oriented toward serving the needs of a diverse community, as well as the federal interests associated with Washington's unique role as the Nation's Capital.

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 101.10 | January 14, 1998 | | 2 of 2 |

## Mission of the Metropolitan Police Department

The mission of the Metropolitan Police Department is to eliminate crime, fear of crime, and general disorder, while establishing respect and trust within the community.

**PART II**      RESERVED

**PART III**     RESERVED

**PART IV**      RESERVED

**PART V**       RESERVED

**PART VI**      RESERVED

**PART VII**     RESERVED

The attachment to this general order contains the department's current organizational chart and executive and command assignments.

*Sonya T. Proctor*

Sonya T. Proctor
Interim Chief of Police

Attachment

STP:WRP

H.P.D General Order 101.10 B attachment



# Metropolitan Police Department

**Chief of Police**
Sonya T. Proctor

General Counsel
Terrance D. Ryan, Esq.

Office of Finance and Budget
Mr. Scott Diehl

Chief of Staff / Office of Planning & Development
Insp. William Ponton

Office of Professional Responsibility
Insp. Ken Diez

Public Information Office
Sgt. Joseph Gentile

**Assistant Chief
Patrol Services**
A/C Robert White

First District
Cmdr. Alfred Broadbent

Second District
Cmdr. Jacqueline Barnes

Third District
Cmdr. Winfred Stanley

**Fourth District**
Cmdr. Ronald Monroe

**Fifth District**
Cmdr. Reginald Smith

Sixth District
Cmdr. John Daniels

Seventh District
Cmdr. Winston Robinson

**Assistant Chief
Support Services**
A/C Rodney Monroe

Special Operations
Division
Insp. Stanley Wigenton

Criminal Investigations
Division
Insp. Lloyd Coward

Youth and Family
Services Division
Capt. Christopher Deison**

**Technical Services Bureau**
A/C Michael Fitzgerald

Information Services
Division
Ms. Deborah Wright*

Communications
Division
Capt. Joel Maupin*

Identification and
Records Division
Mr. Tom Bono

Fleet Management
Division
Mr. Bob Hose

Property
Division
Insp. Abraham Parks

**Assistant Chief
Human Resources Bureau**
Insp. Joseph Adamany

Court Liaison
Insp. Joseph Adamany

Labor Relations
Division
Insp. Glenn Hoppert

Disciplinary Review
Division
Insp. Earl Boyd

Medical Services
Division
Capt. William Godfrey

Training Division
Capt. William Corboy

Office of Recruiting,
Testing & Standards
Capt. Verna Olszewski

Office of Personnel
Ms. Joan Weiss

* Acting Director

** Interim organizational structure for
the Volunteer Services Bureau

# METROPOLITAN POLICE DEPARTMENT

## ORGANIZATIONAL STRUCTURE



OCT. 1999



# GENERAL ORDER



**DISTRICT OF COLUMBIA**

Title
**Uniforms and Equipment**

Topic/Number
**GO-PER-110.11**

Effective Date
**July 22, 2002**

Distribution
**B**

Replaces/Rescinds
**General Order 1101.1 (Personal Appearance, Uniforms & Equipment)**
**Special Order 93-19 (Clothing and Equipment)**
**Special Order 95-8 (Wearing of Uniform Hats)**
**Special Order 99-22 (Wearing of Uniforms)**
**Special Order 00-22 (Surrendering of Service Weapon While Conducting Child Support Business)**

I. Background.........................Page 1
II. Policy................................Page 1
III. Definitions........................Page 1
IV. Regulations.......................Page 2
V. Procedural Guidelines...........Page 3
III. Cross References................Page 12

## I. BACKGROUND

This order establishes the procedures for the issuance, wearing, care, and maintenance of uniforms and equipment. Members assigned to plainclothes or undercover investigations shall conform to the provisions of this order that apply to them. This order shall apply to civilian members where indicated.

## II. POLICY

It is the policy of the Metropolitan Police Department (MPD) to ensure that all sworn and civilian members understand and follow the guidelines pertaining to the appropriate wear and care for the uniform and equipment while representing the Department.

## III. DEFINITIONS

When used in this directive, the following terms shall have the meanings designated:

1. Class "A" Service Uniform — consists of the issued blue dress blouse with long sleeves, uniform shirt and midnight blue tie, all-season trousers, eight-point service hat, and any approved shoes.

2. Class "A" Dress Uniform — shall be the same as the service uniform except the white shirt will replace the blue shirt. The Class "A" dress uniform shall be worn by members on ceremonial occasions (e.g., Awards Ceremonies, Recruit Graduations, Funerals, etc.) or on occasions as designated by the Chief of Police.

3. Class "B" Service Uniform — consists of a nylon or leather jacket, long sleeved blue shirt with tie; or short sleeved blue shirt without tie, all-season trousers, eight-point service hat, and any approved shoes.

**UNIFORMS AND EQUIPMENT (GO-PER-110.11)**



g. Grommets shall not be shortened in circumference or removed from the uniform hat.

h. Members, whose duties require the wearing of a helmet during extended details or for prolonged periods of time, may remove their helmet for brief periods to relieve discomfort caused by continuous wearing.

i. The wearing of a baseball cap is prohibited, except when specifically authorized and issued by the Equipment and Supplies, Uniform and Equipment Section, as part of the issued uniform.

j. The "trooper-style" winter uniform cap, with the Department's seal on the front, may be worn in place of the issued eight-point hat during periods of cold weather.

13. Insignias




a. The identification nameplate shall be visibly worn on the uniform, centered over the right breast pocket, with the bottom of the plate resting on the top seam of the pocket.

b. When worn on a jacket, other than the blouse, it shall be worn in the tab on the right breast provided for that purpose.

c. The foreign language designation pin shall be placed on the lower left-hand corner of the flap of the right-hand shirt pocket.

d. Rank insignias shall be worn as:

   (1) Epaulet sleeves on the uniform shirt and the authorized military-style sweater.

   (2) Silver metallic insignia on the uniform blouse and jackets.

e. Rank Insignias shall be as follows:

   (1) Chief of Police (Four Silver Stars),
   (2) Executive Assistant Chief (Three Silver Stars),
   (3) Assistant Chief (Two Silver Stars) or (One Silver Star),
   (4) Commander (Silver Eagle),
   (5) Inspector (Silver Oak Leaf Cluster),
   (6) Captain (Two Silver Bars),
   (7) Lieutenant (One Silver Bar),
   (8) Sergeants (Three Chevrons),
   (9) Master Patrol Officer (Patch)
   (10) PFC Officer (1 Chevron)
   (11) Officer (Badge)




**Metropolitan Police Department**
Chief Charles H. Ramsey
www.mpdc.org

**For MPD Use Only**

**Vol. 2, No. 8  Jan. 12, 2000**

# The Dispatch

*Wednesday*

## 5D Seek Suspects, Vehicle in Murder

Fifth District Detectives are seeking assistance in the Dec. 18, 1999 murder of 24-year-old Robert Stephen Lewis.

At approximately 3:45 a.m., Dec. 18, Lewis and two other men were in a car that was fired upon by another vehicle.

Lewis was transported to Prince George's Community Hospital where he was pronounced dead. A second victim was taken to an area hospital where he was admitted in critical condition. The third victim was unharmed.

During the course of the investigation, 5th District detectives received information which indicated that the suspect vehicle (shown above) may have run a red light at E. Capitol Street and Benning Rd, NE.



The vehicle in question was reportedly stolen during a carjacking. It is described as a dark colored 1994 Ford Crown Victoria sedan, bearing temporary tags. This photo may be seen in color on the MPD Web site: *www.mpdc.org*.

Members with information about this investigation should contact 5th District detectives at 727-4504.

## 3-1-1: New Non-Emergency Number

Today the MPD publicly unveils 3-1-1 as the District's new telephone number for police non-emergencies. 3-1-1 is easy to use, easy to remember and toll-free.

3-1-1 should help improve the effectiveness of our 9-1-1 system by making it easier for residents and visitors to report non-emergencies. And with fewer non-emergency calls to 9-1-1, PSA and other officers should have more time for proactive community policing activities.

The District's current non-emergency number, 727-1010, will remain an active phone number to provide service to alarm companies and callers from outside the District.

If citizens cannot get through to 3-1-1 on residential, cell or pay phones, they should call 727-1010 to report their non-emergency and tell the call taker the location and service provider of the phone that would not connect with 3-1-1.

Educating the public about when and how to call 3-1-1 and 9-1-1 will be a critical part of our efforts to improve public safety service in the District.

For more information on 3-1-1 or copies of brochures, flyers and other materials, contact Corporate Communications at 727-3766.

MAKE THE RIGHT CALL



**3 1 1**

FOR POLICE NON-EMERGENCIES

---

## DC's Most Wanted

ROC North
Contact:
4th District
576-6726



**Desmond Seen Singh:**
Wanted for Murder. DOB: 1/8/72, Height: 5'4", Weight: 130 lbs, Hair: Black, Eyes: Brown, Last known address: Pine Ridge Ct, Germantown, MD.



ROC Central
Contact:
5th District
727-4595.

**Delroy Ford:** Wanted for Robbery. Aliases: Delroy Thompson. Nickname: "Short Man." DOB: 2/23/74.Height: 5'5", Weight: 140 lbs, Eyes: Brown, Hair: Black.

ROC Central
Contact:
3rd District
673-6914.



**Joshua Henry:** Wanted for Murder. Alias: Mike. DOB: 6/1/66. Height: 6'0", Weight: 180 lbs, Eyes: Brown, Hair: Black, Last known address: 2100 block of V St., NW.

**Today's Roll Call Training Topic: Vehicular Pursuits**

**Review General Orders 301.3 and 501.6.**

# New Rank, Insignia for MPD

During the recent ceremony promoting and/or reassigning officers, several people mentioned the new rank structure/insignia.

While these changes have been in effect for almost two years, not everyone works in a building where they would see the different ranks/insignia, and a request was made to *The Dispatch* to run the old rank structure along side the new rank and insignia.

The newest additions to the MPD rank and insignia are: Commanders, this rank wears a silver eagle; Inspectors now wear a silver oak leaf cluster; Master Patrol Officers have two chevrons above the rocker that says "Master Patrol Officer."

Patrol Officer First Class is a position for members established in 1994 who have completed three years of continuous service where two years were spent as a uniformed officer within patrol or SOD.

They have also complied with the following: not had more than one preventable accident within the preceding year; have their optional sick leave privilege in effect; be eligible to participate in the Expected Tardiness Program; not received more than one PD Form 90 within one year prior to date of consideration; not have had any sustained Adverse Actions within one year prior to the date of consideration; and be exceptional in bearing dress, courtesy, and emotional control. See Special Order 94.6 for more information.

All rank insignia of Sergeant and above is now to be worn on epaulets.

| Old Rank/Insignia | Current Rank/Insignia |
|---|---|
| **Chief of Police**  | **Chief of Police**  |
| | **Executive Assistant Chief**  |
| **Assistant Chief**  | **Assistant Chief** (ROC Commanders)  |
| **Deputy Chief**  | **Assistant Chief**  |
| | **Commander**  |
| **Inspector**  | **Inspector**  Silver Oak Leaf Cluster |
| **Captain**  | **Captain (No Change)**  |
| **Lieutenant**  | **Lieutenant (No Change)**  |
| **Sergeant**  | **Sergeant (No Change)**  |
| **Master Patrol Officer**  | **Master Patrol Officer**  |
| | **Patrol Officer First Class (PFC)**  |